Dennis O. WEDDINGTON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: May 17, 1988.
Supplemental Memoranda: July 1, 1988.
Decided: July 7, 1988.

Brian J. Bartley (argued) and Bernard J. O'Donnell, Asst. Public Defenders, Wilmington, for appellant.

Charles M. Oberly, III, Atty. Gen., Loren C. Meyers (argued), Charles E. Butler, and Richard E. Fairbanks, Jr., Deputy Attys. Gen., Wilmington, for appellee.

Before CHRISTIE, C.J., WALSH and HOLLAND, JJ.

HOLLAND, Justice:

The defendant-appellant, Dennis O. Weddington ("Weddington"), was indicted on charges of Attempted Murder in the First Degree, Possession of a Deadly Weapon During the Commission of a Felony, and Assault in the Second Degree. Weddington was arraigned and entered pleas of not guilty. Weddington filed a pretrial motion to sever the trial of the assault charge from the trial for the attempted murder and weapon's charges. That motion was denied at an unreported office conference. Following a jury trial, Weddington was found guilty as to all counts of the indictment.

For the crime of Attempted Murder in the First Degree, Weddington received a life term of imprisonment. For the crime of Possession of a Deadly Weapon During the Commission of a Felony, Weddington was sentenced to a term of imprisonment for five years. For the crime of Assault in the Second Degree, Weddington received a term of imprisonment of fifteen years to be suspended after serving ten years for a five-year period of probation.

On appeal, Weddington contends that five series of questions asked by the prosecutor of Weddington and three other witnesses denied him a fair trial and justified the declaration of a mistrial. Weddington also contends that the trial court abused its discretion in denying his pretrial motion for severance. The State admits that one of the prosecutor's questions could be viewed as raising the specter of racial bias against Weddington based on a cultural fear of miscegenation.

In this appeal, the State originally contended that the prosecutor's question, although admittedly improper, constituted a harmless error and that Weddington was not denied a fair trial. The State recently requested and was granted permission to file a supplemental memorandum. The supplemental memorandum states that subsequent to the oral argument in this case, the Attorney General of the State of Delaware has reviewed this case, including the briefs filed with this Court and the tape recording of the oral argument. The State represents that after the review by the Attorney General of the State of Delaware, it no longer desires to argue that the prosecutor's improper question was harmless:

> [N]otwithstanding the State's initial position on appeal that this admittedly improper question was harmless error, the Attorney General has determined that in light of the issue affected by the questioning, the closeness of the case, and the particular corrective instructions given by the Superior Court judge, ... a new trial should be awarded to Weddington.

We have considered the arguments of the parties, the improper question asked by the prosecutor, and the curative instruction given by the Superior Court in the context of this case. We do not find that the prosecutor's admittedly improper question was harmless beyond a reasonable doubt. Therefore, Weddington's convictions are reversed.[1] We are unable to find an abuse of

---

1. The questions which we do not address in this opinion can generally be described as involving "prior bad acts" by Weddington. They were typically asked by the State during the cross-examination of a particular witness to demonstrate bias or ascertain the witness' knowledge of specific instances of Weddington's conduct after Weddington had made his own character for nonviolence an issue in the case. Since Weddington's convictions are reversed, the introduction of "prior bad acts" at his next trial will be guided by the standards set forth in *Getz v. State*, Del.Supr., 538 A.2d 726 (1988). If Weddington places his own character for non-

discretion in the trial court's decision to deny Weddington's motion for a severance in the absence of a record of the office conference. Weddington may renew that motion prior to his next trial.

## The State's Case

Terry Hopson ("Hopson"), the victim, first met Weddington in October 1984 in Wilmington shortly after Hopson moved from Indiana, Pennsylvania. Hopson is a white female. Weddington is a black male. The pair became romantically involved. From 1984 until January 1986, Hopson periodically lived with Weddington at his parents' house in Wilmington. She apparently never stayed longer than two months at a time.

In January 1986, Hopson was living with friends in Wilmington. Weddington had begun a relationship with another woman who was then living with him at his parents' home. However, Weddington was still seeing Hopson. As a result of the continuing relationship between Hopson and Weddington, the other woman "left" Weddington for a few days. During that period, Hopson resumed her prior living arrangements with Weddington in a first floor bedroom of his parents' home.

On the afternoon of Friday, January 24, 1986, Hopson left Weddington's parents' house. She returned about 2:00 a.m. the following morning. Weddington was already in bed. The two began arguing about the fact that Hopson had been out that night. Weddington hit Hopson twice while they were in the bedroom. He then dragged her into the basement and continued to beat her. At some point in time, Weddington apologized to Hopson, and the pair left the basement and returned to bed.

After she awoke, later on the day of the assault, Hopson left the Weddington house and did not return. She went to the apartment of Lonnie and Susan Hill in Wilmington. According to Susan Hill, Hopson's face was bruised and swollen. Hopson told Susan Hill that Weddington had beaten her. Hopson went to the hospital and returned to the Hills' apartment. Hopson did not report the incident to the police because she did not want Weddington to go to jail.

On February 4, 1986, Weddington and Hopson saw each other again at the Hills' apartment. In response to the sound of a knock at the foyer door on that date, Hopson told Lonnie Hill that if the visitor was Weddington, she did not want to talk to him. Hill went to the door and found that the visitor was Weddington. Hill went back into the apartment and told Hopson that he was tired of concealing her presence from Weddington and that she needed to talk to Weddington herself. Hopson then went out into the foyer and found Weddington standing there alone. According to Hopson, they talked about a possible reconciliation. When Hopson refused to leave with him, Weddington reached into the pocket of his jacket and produced a pistol. At the same time, he put his arm around her neck and then pointed the pistol at her head. Hopson asked Weddington not to shoot her. Weddington's response was to tell her that she was coming with him. When Hopson refused to go with him, Weddington fired the pistol. The bullet passed through Hopson's head beneath both of her ears. Lonnie Hill rushed out of the apartment and into the foyer when he heard the shot. Hill succeeded in taking the pistol from Weddington, who immediately fled from the scene.

## Weddington's Defense

Weddington presented a very different version of both events. He admitted his prior romantic involvement with Hopson. However, he asserted that Hopson had moved out of his parents' home in December 1985 and had not resumed her residence there in January 1986. Thus, he could not have assaulted her in his parents' home on January 24. Therefore, with respect to the January assault charge, Weddington's defense was a complete denial that he was Hopson's assailant.

violence at issue in his next trial, the proper procedure for cross-examining each reputation witness should be followed. *See* G. Lilly, *An*

*Introduction to the Law of Evidence* § 5.7 (2d ed. 1987).

Weddington's account of the February 4th incident is also contrary to Hopson's testimony. According to Weddington, on February 4, he received a phone call from Hopson during which she indicated she had taken "the" pistol [2] from its hiding place in the Weddington home and would not return it unless Weddington returned her clothes. Weddington testified that he agreed to return Hopson's clothes. Weddington and Tom Hammond, a friend, drove to the Hills' apartment on the evening of February 4. Hammond waited in the car.

According to Weddington, he and Hopson talked in the foyer about exchanging her clothes and the pistol. Weddington testified that Hopson eventually agreed to return the pistol and went back into the Hills' apartment to obtain it. However, according to Weddington, when Hopson returned with the gun, she stated that she was going to shoot him. As the two struggled for control of the pistol, the pistol discharged and struck Hopson. Weddington then grabbed the pistol from the floor to prevent Hopson from shooting him. Lonnie Hill emerged from the apartment and disarmed him. Weddington told Hill that the shooting was an accident, but Hill told Weddington to leave. Weddington walked towards his parents' home since Hammond had driven away after hearing the gunshot. The police arrested Weddington near his parents' home shortly after the shooting.

### "Loose White Women" Question

In surrebuttal, Weddington introduced evidence that he and several people had once travelled to see Hopson in Indiana, Pennsylvania. According to Weddington, he and two of his friends had gone, at Hopson's request, to bring her back to Wilmington. During Weddington's cross-examination, the following colloquy took place:

Q. Mr. Weddington, isn't it true that you got [Edmund] Blue and [William] Henry to go up to Indiana with you because you told them there was [sic] some *loose white women* up there?

A. I don't know what you're talking about.

(Emphasis added).

Weddington's attorney objected to the question and moved for a mistrial on the ground that the State had brought racial prejudice into the case by this question and was attempting to "show that somehow my client is prejudiced or is somehow telling individuals that they should go up and have sex with these loose women." In response to the motion for a mistrial, the court asked the prosecutor to identify the basis for his question. The prosecutor responded in part:

MR. BUTLER: .... The defense had made a practice through three days now of assassinating this victim's character in every possible way, and I think it's simply a question to be asked. If the witness admits it, fine; if not, fine. If the answer is no, then it's not testimony, it's not part of the record, it's not something to be argued with the jury, and it's dropped.

And that's simply the only reason it was asked.

THE COURT: I guess my question is, do you have any reason to believe that that's what he told these people? Do you have any factual basis?

MR. BUTLER: Your Honor, as far as information, statements from witnesses, or verifiable police reports, no, I do not.

After considering the arguments of counsel, the trial judge made the following ruling:

As to the one question with regard to the loose white women, I think that was an improper question given that there was no basis for that to be the reason that he would have asked these people to go up there. There was no foundation or substantiating testimony. I don't think it arises to the problem of a mistrial. If the defense wants, I will instruct the jury to disregard that question and the answer.

2. The ownership of the pistol was disputed at trial.

MR. RAMUNNO: Your Honor, I think the prejudice has already been done, but, yes, in order to attempt to somehow alleviate it, I don't think it can be done, but it's better than nothing.

THE COURT: Okay, well, I will instruct them to disregard that question and the answer.

On appeal, Weddington argues that the prosecutor's question was so prejudicial that it compromised the impartiality and fairness of his trial. This Court has previously held that when a prosecutor brings the issue of religious beliefs before a jury, he acts improperly by appealing to the jury's passions and prejudices rather than to their reasoned responses which are the only proper tools for deciding a case. *Hooks v. State*, Del.Supr., 416 A.2d 189, 205 (1980). The same reasoning applies when the issue of race is improperly injected into a criminal proceeding. In fact, the commentators to the American Bar Association ("ABA") Standards for the Prosecution Function state unequivocally that "[a]rguments which rely upon racial, religious, ethnic, political, economic or other prejudices of the jurors introduce elements of irrelevance and irrationality into the trial which cannot be tolerated in a society based upon the equality of all citizens before the law." ABA, *Standards Relating to the Prosecution Function and the Defense Function* § 5.8 commentary c (Approved Draft 1971).

The ABA Standards for the Prosecution Function provide:

It is unprofessional conduct for a prosecutor knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, *ask legally objectionable questions*, or make other impermissible comments or arguments in the presence of the judge or jury.

ABA, *Standards for Criminal Justice* § 3–5.6(b) (1980) (emphasis added). This Court has repeatedly recognized the unique role of the prosecutor in the judicial process:

Although the prosecutor operates within an adversary system, his duty is to seek justice, not merely convictions.

"A prosecuting attorney represents all the people, including the defendant who was being tried. It is his duty to see that the State's case is presented with earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial." *Bennett v. State*, Del.Supr., 164 A.2d 442, 446 (1960). That same duty requires the prosecutor to refrain from legally objectionable tactics calculated to arouse the prejudices of the jury.

*Sexton v. State*, Del.Supr., 397 A.2d 540, 544 (1979) (footnote omitted), *quoted in Brokenbrough v. State*, Del.Supr., 522 A.2d 851, 855 (1987) (per curiam).

The prosecutor acknowledged that he had no factual basis to believe that Weddington had, in fact, told his companions that there were "loose white women" in Pennsylvania. Moreover, in this appeal, the State acknowledges that the prosecutor's question to Weddington could be viewed as creating racial bias against Weddington based on a cultural fear of miscegenation. The State further admits that if the question is read in that light, it was undoubtedly improper.

The State's candor is commendable. In fact, the State's position on appeal concerning the impropriety of the prosecutor's question has been as responsible as the question at trial was regrettable. The attorney representing the State in this appeal began his oral argument by stating:

Mr. Meyers: May it please the Court, I think the first thing the State is going to say is referring to the loose white woman question, that question is clearly improper. I'm not going to stand here and defend that question as trying to get to admissible evidence or in some sense being proper. As was determined by the trial judge and as Mr. Bartley has pointed out, there was clearly no foundation for that question.

The prosecutor was also present at the oral argument and stated:

Mr. Butler: Your Honor[s], as I suggested to Mr. Meyers, the first thing that Mr. Meyers should do is apologize to the Court as I apologized to Judge Gebelein in the hallway afterwards as well as to the defense counsel that the remark was completely improper and I extended my apologies to all parties.

Following the oral argument, the Attorney General of the State of Delaware reviewed this case, and the State was permitted to file a supplemental memorandum with this Court.[3] In that memorandum, the State represented to this Court:

The Attorney General recognizes a continuing need to internally review cases to ensure that justice is done. Although a change in the State's original trial and appellate position is exceedingly rare, the State submits that upon further internal review, it cannot now argue that this particular error is harmless in light of the facts of this case.

Therefore, the State's final position in this appeal is a confession of error. *Cf. Leonard v. United States*, 378 U.S. 544, 544–45, 84 S.Ct. 1696, 1696, 12 L.Ed.2d 1028 (1964) (per curiam).

A confession of error does not *require* the reversal of the judgment of conviction in the trial court. Despite the apparent agreement of the parties that Weddington should receive a new trial, this Court must make an independent determination that a reversible error was committed. In determining whether the fairness of the trial was adversely affected by prosecutorial action, this Court generally considers three factors: 1) the centrality of the issue affected by the alleged error; 2) the closeness of the case; and 3) the steps taken to mitigate the effects of the alleged

error. *Hughes v. State*, Del.Supr., 437 A.2d 559, 571 (1981).

The State urges this Court to apply the *Hughes* balancing test to the facts in this case. The State now joins Weddington in asking this Court to reverse the decision of the trial judge who ruled that the question was improper and instructed the jury to disregard the question, but denied Weddington's motion for a mistrial. This Court has held that a mistrial is justified only when the event is so prejudicial that the defendant did not receive a fair trial. *See Edwards v. State*, Del.Supr., 320 A.2d 701, 703 (1974).

The State agrees with the defense position that since only Weddington and Hopson were present at each of the alleged assaults, a central issue in the case was the credibility of Weddington *vis-a-vis* the credibility of Hopson. Indeed, the State suggests in its brief and supplemental memorandum that this Court should assume *arguendo* that the prosecutor's question did affect some central issue in the case and that the case was in fact close. The State now agrees with the contention that Weddington's convictions should be reversed because any prejudicial effect that the prosecutor's question may have had upon the trial was not minimized by the curative instruction from the trial judge.[4]

This Court has often held that even when prejudicial error is committed, it will *usually* be cured by the trial judge's instruction to the jury. *Diaz v. State*, Del.Supr., 508 A.2d 861, 866–67 (1986); *Brokenbrough v. State*, 522 A.2d at 857. *See also Edwards v. State*, 320 A.2d at 703; *Boatson v. State*, Del.Supr., 457 A.2d 738, 743 (1983). *Cf. Shantz v. State*, Del.Supr., 344 A.2d

**3.** Weddington was requested to respond to the State's supplemental memorandum. Weddington argues that the unfounded injection of race as an issue into his trial requires a reversal of his convictions *per se*. Since the State has not confessed error with respect to the severance issue, Weddington *continues to argue that his* motion for a severance of his trials on each charge should have been granted.

**4.** The trial court gave the following instruction to the jury:

THE COURT: Ladies and gentlemen, there was a question asked before the recess that basically said something to the effect, or it asked the defendant if he said something to his friends that there were loose white women in Indiana, Pennsylvania, and the Court has ruled that that was *not* a proper question to be asked. So, at this time, I am instructing you to disregard the question as well as the answer, and they should not be used or considered by you in any way in reaching your verdict in this case.

245, 247 (1975). However, we agree with the position of the parties in this appeal. We do not find this to be a case where the prejudicial error was cured by the trial court's instruction.

Other courts have held that when racial prejudices are improperly injected into a criminal trial, "the due process and equal protection clauses overlap or at least meet." *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152, 159 (2d Cir. 1973). An appeal to racial prejudice impugns the concept of *equal protection* of the laws because one of the purposes of the Equal Protection Clause is to eradicate racial considerations from criminal proceedings. *Id.* at 158–59. There is also nothing more fundamental to the *due process* requirements of a fair trial than the right for the accused to have his case heard by an impartial jury. *Styler v. State*, Del.Supr., 417 A.2d 948, 951–52 (1980); *Jackson v. State*, Del.Supr., 374 A.2d 1, 2–3 (1977). "The impartiality of the jury must exist at the outset of the trial and it must be preserved throughout the entire trial." *Miller v. North Carolina*, 583 F.2d 701, 706 (4th Cir.1978).[5] *See Hughes v. State*, Del.Supr., 490 A.2d 1034, 1040 (1985).

The law guarantees that every defendant will have his case decided strictly according to the evidence presented and not by extraneous matters or by the predilections of individual jurors. *Miller v. North Carolina*, 583 F.2d at 706. The overall purpose of our elaborate rules of evidence is "to restrict the deliberations of jurors to that which is trustworthy, probative and relevant." *Id.*[6] A question which improp-

erly injects race as an issue before the jury poses a serious threat to a fair trial. *Id.* Such a question violates the fundamental fairness which is essential to the very concept of justice. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941). "Not only does it undermine the jury's impartiality, but it also disregards the prosecutor's responsibility as a public officer." *Miller v. North Carolina*, 583 F.2d at 706. *See also Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). *Cf. Brokenbrough v. State*, 522 A.2d at 854–64; ABA, *Standards for Criminal Justice* § 3–5.8(c). The *Haynes* court concluded its opinion by noting that "[i]f there is anything more antithetical to the purposes of the fourteenth amendment than the injection against a black man of race prejudice ..., we do not know what it is." *United States ex rel. Haynes v. McKendrick*, 481 F.2d at 159.[7]

The United States Supreme Court has observed that there may be some errors of constitutional magnitude that, in a particular case, are so unimportant and insignificant as to be harmless. *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). But *Chapman* also held that a constitutional error cannot be classified as harmless unless the reviewing court is able to say beyond a reasonable doubt that there was no possibility that the disputed evidence may have attributed to the conviction. *Id.* at 23–24, 86 S.Ct. at 827–28. Weddington contends and the

---

**5.** The United States Supreme Court has addressed the problem of protecting criminal defendants in federal courts from the possibility of racial or ethnic bias among prospective jurors. *See Aldridge v. United States*, 283 U.S. 308, 310–15, 51 S.Ct. 470, 471–73, 75 L.Ed. 1054 (1931).

**6.** "Where evidence is relevant but also prejudicial, the law requires that it not be received until it has been demonstrated that its relevance and probative value outweigh its collateral prejudicial effect." *Miller v. North Carolina*, 583 F.2d 701, 706 (4th Cir.1978). *See Getz v. State*, Del.Supr., 538 A.2d 726, 731–34 (1988).

**7.** Section 1 of the Fourteenth Amendment of the United States Constitution reads as follows:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1. Weddington's convictions resulted in a sentence which denied him liberty for the rest of his life.

State now agrees that a constitutional error occurred as a consequence of the "loose white women" question and that it was not harmless beyond a reasonable doubt. *See id.* at 21–24, 86 S.Ct. at 826–28.

In this case, there were no independent eye witnesses to either altercation between Weddington and Hopson. Therefore, the jury was asked to choose between two conflicting and uncorroborated versions of each incident. An equally important aspect of this case was Weddington's attitude toward women generally and white women specifically. The admitted purpose for the prosecutor's improper question was to retaliate against Weddington for what were perceived to be defense attacks upon the character of the victim. In this context, the impeachment of Weddington's character assumed a critical role.

To the extent that the prosecutor's questioning improperly subjected Weddington to impeachment and achieved its intended result, it had the potential to affect the outcome of his trial. *Cf. Bowe v. State,* Del.Supr., 514 A.2d 408, 410 (1986). Although the trial judge ruled that the prosecutor's question was improper, his instruction to the jury to disregard the question was not responsive to the problems it had raised. *See id.* We cannot say beyond a reasonable doubt that the improper question did not contribute to Weddington's convictions. *Cf. Deputy v. State,* Del. Supr., 500 A.2d 581, 592 (1985) (en banc). However, that is not the basis for our holding in this case.

The question which was asked of Weddington in this case is strikingly similar to a question that was asked in *United States v. Grey,* 422 F.2d 1043 (6th Cir.), *cert. denied,* 400 U.S. 967, 91 S.Ct. 380, 27 L.Ed. 2d 387 (1970). In that case, Grey, a black male, was charged with aiding and abetting in a bank robbery. A character witness for Grey was asked by the prosecutor whether he knew that Grey "was running around with a white go-go dancer." *Id.* at 1045. The United States Court of Appeals for the

Sixth Circuit found that "[a]t best, the entire question was a magnificent irrelevance in a prosecution for bank robbery ... [and] [a]t worst, the gratuitous reference to the race of the go-go dancer may be read as a deliberate attempt to employ racial prejudice to strengthen the hand of the United States government." *Id.* The *Grey* court held that when "such prejudicial tactics may have had a substantial influence upon the results of a trial," the defendant's convictions *must* be reversed. *Id.* at 1046. This Court has also held that improper questions by a prosecutor may result in overreaching that is incompatible with the due process which the Delaware Constitution guarantees to all defendants in criminal trials. Del. Const. art. I, § 7. *Cf. Bowe v. State,* 514 A.2d at 410.[8]

The United States Supreme Court has recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error...." *Chapman v. California,* 386 U.S. at 23, 87 S.Ct. at 827 (footnote omitted). As the United States Court of Appeals for the Second Circuit has noted:

> Race is an impermissible basis for any adverse governmental action in the absence of compelling justification.... To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended.
>
> ... [G]iven the general requirement that the race of a criminal defendant must not be the basis for any adverse inference, any reference to it by a prosecutor must be justified by a compelling state interest.

*McFarland v. Smith,* 611 F.2d 414, 416–17 (2d Cir.1979). In our opinion, the right to a fair trial that is free of improper racial

U.S. Const. amend. XIV, § 1. Weddington's convictions resulted in a sentence which denied him liberty for the rest of his life.

8. In *Bowe,* this Court held that improper ques-

right to remain silent which is guaranteed by the Fifth Amendment of the United States Constitution. *Bowe v. State,* Del.Supr., 514 A.2d 408, 410–12 (1986).

implications is so basic to the federal Constitution that an infringement upon that right can never be treated as harmless error. *Cf. Miller v. North Carolina,* 583 F.2d at 708. Accordingly, we find that the present case falls into the category of constitutional violations to which, as *Chapman* recognizes, the harmless error rule does not apply. *See Chapman v. California,* 386 U.S. at 23 & n. 8, 87 S.Ct. at 827 & n. 8; *Race and the Criminal Process,* 101 Harv.L.Rev. 1472, 1588–95 (1988).[9] We also hold, as a matter of Delaware law, that the improper injection of race as an issue into a criminal proceeding violates the right of due process which is guaranteed to all defendants in a criminal case under the Constitution of this State.[10] Del. Const. art. I, § 7; *Goddard v. State,* Del.Supr., 382 A.2d 238, 240 (1977); *Bowe v. State,* 514 A.2d at 410. Weddington's motion for a mistrial, following the "loose white women" question, should have been granted. Therefore, Weddington's convictions are reversed.

*Motion to Sever*

In a three-count indictment, Weddington was charged with second degree assault, based on the January 25th assault of Hopson, and with attempted first degree murder and possession of a deadly weapon during the commission of a felony, based on the February 4th shooting. Weddington filed a pretrial motion to sever his trial on the assault charge under Superior Court Criminal Rule 14. The Superior Court denied that motion.

■ Under Superior Court Criminal Rule 8(a), two or more offenses may be joined in the same indictment provided that one of the following circumstances exist: the offenses are of the same or similar character; the offenses are based on the same act or transaction; the offenses are based on two or more connected acts or transactions; or the offenses are based on two or more acts or transactions constituting parts of a common scheme or plan.[11] The rule of joinder "is designed to promote judicial economy and efficiency, provided that the realization of those objectives is consistent with the rights of the accused." *Mayer v. State,* Del.Supr., 320 A.2d 713, 717 (1974), *quoted in Sexton v. State,* Del.Supr., 397 A.2d 540, 545 (1979). However, if it appears that the defendant is prejudiced by a joinder of offenses in an indictment, the Superior Court may sever the offenses and order separate trials even though the offenses were properly joined in the same indictment.[12] *Wiest v. State,* Del.Supr., 542 A.2d 1193, 1195 (1988); *State v. McKay,* Del.Super., 382 A.2d 260, 262–63 (1978).

---

**9.** *See also* Note, *Harmless Constitutional Error: A Reappraisal,* 83 Harv.L.Rev. 814, 820–24 (1970).

**10.** The Delaware Constitution provides in part that an accused in a criminal prosecution "shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land." Del. Const. art. I, § 7. "The phrase 'due process of law' in the federal Constitution and the phrase 'law of the land', as used in the State Constitution have substantially the same meaning." *Goddard v. State,* Del. Supr., 382 A.2d 238, 240 n. 4 (1977) (citing *Opinion of the Justices,* Del.Supr., 246 A.2d 90 (1968)). "While the State provision may not be interpreted to provide less rights to criminal defendants than those mandated by the Federal provision, it may be interpreted so as to provide greater rights." *Id.*

**11.** Superior Court Criminal Rule 8(a) provides:
Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each of-

fense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Super.Ct.Crim.R. 8(a).

**12.** Superior Court Criminal Rule 14 provides:
If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the Court may order the attorney for the State to deliver to the Court for inspection in camera any statements or confessions made by the defendants which the State intends to introduce in evidence at the trial. Super.Ct.Crim.R. 14.

■ This Court has always held that the decision to grant or deny a motion for severance rests within the sound discretion of the trial court. *Wiest v. State*, 542 A.2d at 1195; *Younger v. State*, Del.Supr., 496 A.2d 546, 549–50 (1985); *Lampkins v. State*, Del.Supr., 465 A.2d 785, 794 (1983); *Bates v. State*, Del.Supr., 386 A.2d 1139, 1141 (1978). That decision will not be overturned by this Court in the absence of a showing of prejudice by the defendant.[13] *Wiest v. State*, 542 A.2d at 1195; *Lampkins v. State*, 465 A.2d at 794; *Bates v. State*, 386 A.2d at 1141–42. Weddington's motion for a severance raised many significant concerns which do not appear to have been either frivolous or perfunctory.[14]

■ In determining whether the trial court has abused its discretion in denying a motion, we must examine the facts in each particular case. *Wiest v. State*, 542 A.2d at 1195; *Bates v. State*, 386 A.2d at 1141. Unfortunately, in this case, when the trial judge denied Weddington's motion for a

severance during an office conference, that office conference was not reported. Therefore, this Court does not have before it the State's position in opposing Weddington's motion. More importantly, this Court does not have before it the basis for the Superior Court's denial of Weddington's motion. However, since we have determined that Weddington's convictions must be reversed, the motion to sever the trial on the respective charges may be renewed prior to his next trial.[15]

### Conclusion

The confession of error by the State and the Attorney General of the State of Delaware in this appeal is in accordance with the highest traditions of the Delaware Bar and the prosecutor's unique role and duty to seek justice within an adversary system.

The decision of the Superior Court to deny Weddington's motion for a mistrial following the "loose white women" ques-

---

13. The prejudice which a defendant may suffer from a joinder of offenses has been described in the following terms: the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; the jury may use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges. *State v. McKay*, Del.Super., 382 A.2d 260, 262 (1978). *See also Wiest v. State*, Del.Supr., 542 A.2d 1193, 1195 (1988); *Drew v. United States*, 331 F.2d 85, 88 (D.C.Cir.1964).

14. Weddington's motion to sever contained the following paragraphs:

4. There are two different sets of criminal incidents or acts occurring on two different dates and different motives and state of mind all in one Indictment.

5. The two sets of charges against Defendant must be severed from each other in order to avoid the extreme prejudice which will result from his being tried with the two sets since they are not related in any way and since the State has different evidence which it will allege implicates the Defendant in these two different criminal acts.

6. If Defendant is tried on the two incidents before the same jury there is a substantial danger that the jury by inadvertence or intent may reach the conclusion that Defendant is actively involved in criminal activities

and/or that the Defendant may be not guilty of one but guilty of both incidents and/or that Defendant is guilty of one and, therefore, he must be guilty of both simply by association not by properly and justly weighing the evidence separately as to each charge and making the distinction between the different state of mind which is involved in determining the guilt of Defendant.

15. Even if it is determined that the prejudice alleged by Weddington is not sufficient to *require* severance of separate offenses, a crucial factor to be considered in making a final determination on the motion should be whether the evidence of one crime would be admissible in the trial of the other crime. *Wiest v. State*, Del.Supr., 542 A.2d 1193, 1195 n. 3 (1988); *Bates v. State*, Del.Supr., 386 A.2d 1139, 1142 (1978). Traditionally, evidence of one crime is inadmissible to prove a general disposition to commit another crime, even if the crime is of the same nature and character as the offense charged. *Wiest v. State*, 542 A.2d at 1195 n. 3; *Getz v. State*, Del.Supr., 538 A.2d 726, 730 (1988). Evidence of other offenses is admissible when it has "independent logical relevance" and its probative value to the State has been balanced against the prejudicial effect on the defendant. *Wiest v. State*, 542 A.2d at 1195 n. 3; *Getz v. State*, 538 A.2d at 730–34; D.R.E. 404(b). The record in this case does not support the proposition that evidence of each alleged attack would be admissible at separate trials. *See Wiest v. State*, 542 A.2d at 1195 n. 3.

tion is REVERSED. Consequently, Weddington's convictions are REVERSED, and this matter is REMANDED to the Superior Court.