Akbar HASSAN–EL, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 472,2005.

Supreme Court of Delaware.

Submitted: Oct. 18, 2006.

Decided: Oct. 26, 2006.

Joseph M. Bernstein (argued) and Andrew J. Witherell, Wilmington, DE, for appellant.

Timothy J. Donovan (argued) and Thomas E. Brown, Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice:

The defendant-appellant, Akbar Hassan–El, and Tyrone Guy, were indicted on charges of Murder in the First Degree (intentional murder); Murder in the First Degree (felony murder); Possession of a Firearm During Commission of a Felony ("PFDCF"); Attempted Robbery in the First Degree; and Conspiracy in the Second Degree. The State advised both defendants that it intended to seek a death sentence in the event of a conviction for Murder in the First Degree.

In November 2003, Hassan–El and Guy were tried together. That proceeding ended in a mistrial after the jury informed the trial court that it was unable to reach a unanimous verdict as to either defendant. After the mistrial, the State elected to try the defendants separately. Guy's retrial took place first and Guy was convicted on all charges.[1]

---

1. *See State v. Guy*, 2005 WL 2436201, at \*5, 2005 Del.Super. Lexis 333, at \*15 (Del.Su-

Hassan–El's retrial commenced on May 17, 2005. The jury found Hassan–El guilty of Murder in the First Degree (felony murder); Murder in the Second degree (a lesser-included offense of intentional murder); PFDCF; Attempted Robbery in the First Degree; and Conspiracy in the Second Degree. Following a penalty hearing, the jury found, unanimously and beyond a reasonable doubt, the existence of the felony-murder statutory aggravating circumstance. The jury also found, by a vote of eleven to one, that the mitigating circumstances outweighed the aggravating circumstances. On September 30, 2005, Hassan–El was sentenced to life imprisonment on the Felony Murder conviction and to a total of forty-five years at Level 5 for the remaining convictions.[2]

### Issues on Appeal

Hassan–El raises three arguments in this direct appeal. First, he submits that his conviction for felony murder should be vacated because the homicide was not "in furtherance of" the underlying felony of Attempted Robbery. Second, Hassan–El contends that the trial judge committed legal error when he instructed the jury that Hassan–El could be found guilty of felony murder provided that the jury found that Hassan–El intended to commit the underlying robbery and that the death of the victim occurred during the course of the attempted robbery and was a "foreseeable consequence" of the attempted robbery. Although Hassan–El acknowledges that the jury instruction given is consistent with this Court's holding in *Claudio v. State*,[3] Hassan–El argues that *Claudio* is inconsistent with Delaware's felony-mur-

der statute and should be overruled. Finally, Hassan–El argues that the trial judge should not have allowed in as evidence the out-of-court interrogation by the police of Robert Zayas, who was the State's main witness, because the statement included the interrogating police officers' opinion as to whether Zayas was telling the truth.

We have concluded that Hassan–El's first two arguments are without merit. The third issue raised by Hassan–El properly identified an error, but under the circumstances of this case, that error was harmless beyond a reasonable doubt. Therefore, the judgments of the Superior Court must be affirmed.

### Facts[4]

Shortly after 10 p.m. on July 18, 2001, the Wilmington Police responded to a 911 call concerning a shooting at 10th and Madison streets. When the police arrived, they found a man who had sustained an apparent gunshot wound lying inside a Jack and Jill Ice Cream truck. The victim, Abdullah Alameri, was unresponsive and was pronounced dead a short time after he was transported to Christiana Hospital. Following an autopsy, it was determined that Alameri had died as a result of a single gunshot wound to his chest.

Inside the ice cream truck, the police recovered a 9mm shell casing near the driver's seat and a 25–caliber casing under a floor mat. The police also found a 25–caliber projectile that had lodged itself in the track of a sliding window on the passenger side of the truck. After the truck was processed by the police, it was re-

---

per.Ct.2005).

**2.** See *State v. Hassan–El,* 2005 WL 2436199, at *8, 2005 Del.Super. Lexis 337, at *23 (Del.Super.Ct.2005).

**3.** *Claudio v. State,* 585 A.2d 1278 (Del.1991).

**4.** This factual recitation is taken substantially from Hassan–El's opening brief.

turned to the Jack and Jill Company in Philadelphia. In the course of cleaning the truck, one of the Company's employees found a second projectile, a 9mm bullet, embedded in a shirt that was located on a shelf in the rear of the truck. The projectile was then turned over to the police.

Shortly after the shooting, the police conducted a neighborhood canvass to find out if anyone living nearby the shooting scene had seen or heard anything. The police also learned that an individual named Keith Flowers had called 911 about the shooting. When the police interviewed Keith Flowers, he told them about an individual named Robert "Whiteboy" Zayas.

During the course of the investigation, the police learned that Zayas had purchased a soda from the ice cream truck driver at 9th and Madison streets just minutes before the shooting. The police also learned from a Tracida Bailey that her boyfriend Marcus Archy may have had information about the shooting. At the time of the shooting, Archy was living on 9th Street, near the corner of 9th and Madison.

In October 2001, Archy was in jail and asked Bailey to contact the police and tell them Archy had information about the shooting. At trial, Archy testified that he knew Zayas, Guy and Hassan–El from the neighborhood. Archy testified that on the night of the shooting, he first saw the ice cream truck at the corner of 9th and Madison. He also saw Hassan–El, who told him that "something crazy was about to go down," but did not say what it was.

Archy testified that he saw Guy and Zayas on the sidewalk in front of Guy's house, which was on Madison, midway between 9th and 10th streets. He also saw Hassan–El walking toward Guy and Zayas. Archy then began walking west on 9th Street, toward his house, when he heard gunshots. He looked up the street and saw Zayas, Guy and Hassan–El running toward 10th Street headed east.

Several minutes later, Archy saw Hassan–El coming down Madison Street. Archy testified that Hassan–El told him that Guy shot the ice cream man. Hassan–El told Archy that Guy had a 25–caliber weapon. Hassan–El also told Archy that he too had fired a shot, but that it did not hit the ice cream man. Archy testified that he did not see any of the three men with a weapon that evening and that Hassan–El seemed shocked about what had happened. A short time after this conversation with Hassan–El, Archy saw Zayas, who also told him that Guy had shot the ice cream man.

Keith Flowers testified at the trial that he had made a 911 call to the police just after the shooting. He also testified that when the police first contacted him, he did not want to get involved with the case and initially told them that he did not know anything about the shooting. At trial, Flowers testified that he lived next door to Guy and that he also knew Hassan–El, who lived around the corner on 9th Street. On the evening of the shooting, Flowers had been out looking to buy some marijuana. When he came out of his house, Flowers saw Guy, Hassan–El and Zayas standing on the sidewalk.

Flowers testified that as he was walking toward his house, he saw the ice cream truck parked at the corner of 9th and Madison. He saw the truck continue up Madison Street to 10th Street and then he heard gunshots. He did not see who had fired the shots. He saw three people near the truck, whom he identified as Zayas, Guy and Hassan–El. Flowers testified that he did not see their faces, but recognized them by the clothing they were wearing. He then saw the three men run

east on 10th Street. He returned to his house to call 911.

Zayas testified that just before the shooting, he had bought a soda and a pretzel from the ice cream man at 9th and Madison. He then realized that the soda was frozen and he wanted to return it. He walked up Madison Street, where he saw Guy and Hassan–El "laying low in-between the steps" and "in the bushes a little bit." According to Zayas, Hassan–El told him about a plan to rob the ice cream man. Zayas saw that Guy had a 25-caliber handgun. Zayas told them their idea was stupid. They asked Zayas to flag down the ice cream truck. Zayas testified that he did not want to do it, but he also wanted to exchange his soda.

The ice cream truck pulled over at 10th and Madison, and Zayas went up to the truck and asked to exchange his soda. As Zayas was standing at the window, he watched Guy and Hassan–El come up to the truck. They had t-shirts around their faces. He saw Guy with a gun. He did not see Hassan–El with a gun. Hassan–El tried to boost Guy up through the window of the truck. Zayas heard two shots and saw Guy fire a shot that hit the ice cream man.

All three of them then fled down an alleyway that ran behind Guy's house, parallel to Madison Street. Zayas then ran back to the ice cream truck to see about the condition of the ice cream man. A short time later, Zayas approached Archy, and, according to Archy, was upset. Za-

yas told Archy that both Hassan–El and Guy had fired their guns, but that Guy had shot the ice cream man. Zayas also told Archy that he was scared because he had been the one who had flagged down the truck. Zayas then went home because he was scared.[5]

### "In Furtherance of" Attempted Robbery

■ At the conclusion of the State's case-in-chief, the defense moved to dismiss Count II (felony murder). The motion was based on the defense's application of this Court's holding in *Williams v. State*[6] to the evidence presented by the State. The defense's motion was denied by the trial judge. Hassan–El renews the same arguments in this appeal.

When this homicide was committed in 2001, title 11, section 636(a)(2) of the Delaware Code provided that a person is guilty of "felony-murder" when "[I]n the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, the person recklessly causes the death of another person." This statute was subsequently amended.[7] Hassan–El notes that although any "felony" or "attempted felony" will suffice, the statute also required that the death must be "in the course of and in furtherance of the commission or attempted commission of a felony...."[8] In this case, the "attempted felony" was robbery.

Hassan–El acknowledges that the murder was clearly "in the course of" the attempted robbery, and submits that the

5. After Zayas completed his testimony on direct examination, the jury saw a videotape of an out-of-court interrogation of Zayas by the police that took place on July 24, 2001.

6. *Williams v. State*, 818 A.2d 906 (Del.2003).

7. Effective May 19, 2004, section 636(a)(2) was amended by eliminating the phrase "in the course of and in furtherance of." That

section now provides that a person is guilty of "felony-murder" when, "[w]hile engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any felony, the person recklessly causes the death of another person." *See* Del.Code Ann. tit. 11, § 636(a)(2) (2006).

8. Del.Code Ann. tit. 11, § 636(a)(2).

real issue is whether the murder was also "in furtherance of" the attempted robbery. The meaning of the "in furtherance of" requirement in the felony-murder statute was explained by this Court in *Williams:*

> In our view, the statutory language of the Delaware felony murder statute not only requires that the murder occur during the course of the felony but also that the murder occur to facilitate commission of the felony. To the extent that the *Chao*[9] opinion states that the "in furtherance of" language of the statute addresses solely the identity of the person who is committing the actual killing, it is overruled. Accordingly, we adhere to the holding of *Weick*[10] and hold that the felony murder language requires not only that the defendant, or his accomplices, if any, commit the killing but also that the murder helps to move the felony forward.[11]

Applying the *Williams* test, Hassan–El frames the question presented in this appeal as: How did the murder "help to move the felony (attempted robbery) forward?" In denying Hassan–El's motion for acquittal, the trial judge reasoned that the killing did satisfy the "in furtherance of" requirement in *Williams:*

> The killing of Mr. Alameri, since he no longer would be in a position to prevent the robbery from taking place, in essence, has furtherance—has furthered the robbery process, has moved the robbery process along. Now, simply because the defendants, either because they got scared, or they decided it wasn't worth it anymore, moved on, and did not complete the robbery, I don't believe has any bearing upon the

*Williams* decision. Once the murder has taken place, it has facilitated and moved forward the robbery. It is the defendant's decision at that point in time to complete the act. But *Williams* doesn't say it prevents a felony murder from proceeding forward.

Hassan–El argues that the trial judge's interpretation of the "in furtherance of" requirement allowed a conviction for felony murder based entirely on the "supposition" that the killing cleared the way for the underlying felony of robbery to proceed to completion. According to Hassan–El, the trial judge's reasoning "ignores what actually happened. If the killing was intended to further the commission of the robbery, then why did Zayas, Hassan–El and Guy all run away after the shots were fired?"

Hassan–El's argument fails to recognize that the felony-murder charge was based upon an attempted robbery not a completed robbery. Hassan–El's contention is contrary to the express statutory language that makes homicides during an attempted felony the crime of felony murder. The discussion concerning the law of "attempts" in Hassan–El's opening brief explains why the homicide in this case served to "further" the attempted robbery and was, therefore felony murder.

■ Under the Criminal Code, an "attempt" to commit a crime occurs when the defendant's conduct is a " 'substantial step' in a course of conduct planned to culminate in the commission of the crime."[12] A "substantial step," in turn, is defined as an "act or omission which leaves no reasonable doubt as to the defendant's intention

9. *Chao v. State,* 604 A.2d 1351, 1363 (Del. 1992).

10. *Weick v. State,* 420 A.2d 159, 162 (Del. 1980).

11. *Williams v. State,* 818 A.2d at 913.

12. Del.Code Ann. tit. 11, § 531(2).

to commit the crime."[13] The law of "attempts" under the Criminal Code "seeks to prevent even the preparations from crime by threatening punishment prior to the completion of the crime."[14] In other words, the crime of "attempt" is completed whenever the defendant has taken a "substantial step" toward the commission of the crime, whether or not the crime itself ever actually occurs.[15]

Hassan–El and Guy were clearly engaged in an attempted robbery because they had taken substantial steps toward the commission of a robbery when the homicide occurred. The record reflects that Hassan–El and Guy both approached the ice cream truck with their faces covered by shirts. They each carried loaded handguns. They both fired their weapons immediately upon reaching the ice cream truck.

The General Assembly anticipated the fact that every intended felony (in this case robbery) might not be completed. The felony-murder statute expressly provides that a homicide committed during an attempted felony can constitute felony murder. When Hassan–El attempted to commit a robbery of the ice cream man, the homicide that resulted was felony murder because it occurred "in the course of and in furtherance of the ... attempted commission of a felony," even if the separate felony of robbery was not accomplished—for whatever reason.

In a related argument, Hassan–El contends the homicide must have been an accident since the robbery was never completed and an "accidental" killing is insufficient to satisfy the state of mind needed by the "in furtherance of" requirement in the felony-murder statute. Hassan–El correctly notes that this Court has recognized that a defendant's claim of accident is a defense that the defendant's culpable state of mind was a lesser degree than that required for a conviction of felony murder.[16] The fact that Hassan–El or any other defendant could present a "state of mind" defense based upon a claim of accident, however, does not mean the defendant is entitled to have a felony-murder charge dismissed as a matter of law.

The State's evidence presented a strong case that Hassan–El was guilty of felony murder because the homicide occurred in furtherance of an attempted robbery. Hassan–El's state of mind was a question for the jury to decide. The record supports the trial judge's ruling that the jury could rationally conclude the shooting occurred "in furtherance of" the attempt to commit a robbery.

### Homicide Was "Foreseeable Consequence"

■ In this appeal, Hassan–El acknowledges that, "viewing the evidence most favorably to the State, it is clear that [he] was an accomplice to the planned robbery of the ice cream man." Although there is no evidence that any of the participants intended a killing to occur, Hassan–El had a loaded gun and was aware that Guy had a handgun when they approached the ice cream truck. Zayas testified that Guy and Hassan–El both fired their guns almost immediately.

---

13. Del.Code Ann. tit. 11, § 532.

14. *Del.Crim.Code With Commentary*, § 531, at 151 (1973).

15. *Id.* § 532, at 156 ("The problem is to identify the point at which the police are to be authorized to arrest a person who is preparing to commit a crime").

16. *Hall v. State*, 431 A.2d 1258, 1260 (Del. 1981).

Defense counsel requested the trial judge to instruct the jury that Hassan–El could only be found guilty of felony murder if his intent as an accomplice was equivalent to the state of mind required for a conviction of felony murder, i.e., that Hassan–El had to have acted either "recklessly" or with "criminal negligence" with respect to the risk that death would result from the underlying felony of robbery. Hassan–El's defense also proffered a proposed instruction to the trial judge. Defense counsel acknowledged that the proposed instruction was contrary to this Court's holding in *Claudio v. State*.[17]

Based upon *Claudio*,[18] the trial judge instructed the jury members that they could convict the defendant of felony murder as an accomplice if the murder was a "foreseeable consequence" of the robbery, regardless of whether the defendant specifically intended that the murder occur. The felony murder instruction to the jury contained the following language:

It is also the law of the state that all persons who join together with a common intent and purpose to commit an unlawful act which, in itself, makes it foreseeable that a criminal offense not specifically agreed upon in advance might be committed are responsible for the commission of such incidental or consequential criminal offenses whenever the second offense is one in furtherance of or an aid to the original contemplated unlawful act. And in that regard, if you unanimously find, beyond a reasonable doubt, that a principal-accomplice relationship existed between the defendant and Mr. Guy to rob the victim, and you find it is reasonably foreseeable that as a consequence of the robbery, that another offense might be committed in furtherance of the rob-

bery, then all participants are responsible for the consequential criminal offense without the jury having to find that the defendant specifically intended the result of that consequential criminal offense.

In this appeal, Hassan–El asks this Court to overrule *Claudio* and hold that the trial judge's "foreseeable consequence" instruction in this case was reversible error.

In *Claudio*, as in this case, the defendant was convicted of felony murder based on "accomplice liability." In *Claudio*, we addressed the elements necessary to impose liability on a defendant who was an "accomplice" to the felony murder:

The inquiry under § 271 is not whether each accomplice had the specific intent to commit murder, but whether he intended to promote or facilitate the principal's conduct constituting the offense. The defendants did not have to specifically intend that the result, a killing, should occur. As long as the result was a foreseeable consequence of the underlying felonious conduct their intent as accomplices includes the intent to facilitate the happening of this result (internal citations omitted).

Thus, Delaware law requires the jury to unanimously find that a principal-accomplice relationship existed between the participants with respect to a particular charge, e.g., in this case, robbery at knife point. *Probst v. State*, 547 A.2d 114, 123 (Del.1988). However, the jury is not required thereafter to find that the defendants specifically intended the result of a consequential crime which occurs, e.g., in this case, murder and attempted murder. *Id.* In *Martin*, for example, the defendants originally

**17.** *Claudio v. State*, 585 A.2d 1278, 1281–82 (Del.1991).

**18.** *Id.*

agreed to burglarize a home for the purpose of stealing weapons. *Martin v. State,* 433 A.2d [1025] at 1028. This Court held that both were properly charged, pursuant to 11 *Del. C.* § 271, with the murder committed in furtherance of the burglary.[19]

Hassan–El argues that this Court misinterpreted the accomplice liability statute[20] in *Claudio,* as applied to felony murder. In the felony-murder context, Hassan–El argues that the "offense" referred to in section 271, the offense that Hassan–El intends to "promote or facilitate," is not the underlying felony of robbery, but the murder. That argument was rejected by this Court in *Hooks v. State,*[21] where we stated:

> The inquiry under § 271 is not whether each accomplice had the specific intent to commit murder, but whether he intended to promote or facilitate the principal's conduct constituting the offense. The defendants did not have to specifically intend that the result, a killing, should occur. As long as the result was a foreseeable consequence of the underlying felonious conduct their intent as accomplices includes the intent to facilitate the happening of this result.[22]

The facts in Hassan–El's case are directly applicable to the ultimate holding in *Hooks:*

> ... all the defendants knew that guns were to be carried and if necessary used in the course of the robbery. Therefore, under the evidence, including the use of guns to aid the criminal activity, appellants could be found guilty as accomplices to first degree felony murder committed by the act of another person.[23]

Hassan–El also argues that the "foreseeable consequence" instruction given to the jury based upon this Court's holding in *Claudio* and *Hooks* relieves the jury of the need to find a *mens rea* element to convict the defendant of felony murder. That argument is not supported by the record. Hassan–El's quotation of the "foreseeable consequence" portion of the jury instruction must be read in the context of the entire charge to the jury.

The trial judge instructed the jury regarding the *mens rea* requirement as follows:

> The third element is that the defendant acted recklessly. And a person acts recklessly with respect to the act causing death again when the person is aware of and consciously disregards a substantial and unjustifiable risk that death will occur as a result of his conduct. The risk must be of such a nature and degree that the disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would have observed in the situation.

If one "is aware of and consciously disregards a substantial and unjustifiable risk that death will occur as a result of his conduct," then death is a "foreseeable consequence" of that conduct. Similarly, if death is a "foreseeable consequence" of certain conduct and an individual nevertheless engages in that conduct, then that individual acts recklessly, as defined in the trial judge's instruction to the jury.

The concept of criminal liability embodied in *Claudio* and *Hooks* is that if the "accomplice" intended to commit the un-

---

19. *Id.*

20. Del.Code Ann. tit. 11, § 271.

21. *Hooks v. State,* 416 A.2d 189, 197 (Del. 1980).

22. *Id.* at 197.

23. *Id.*

derlying felony, i.e., armed robbery, then he or she is also guilty of any "consequential crime" that is committed, i.e., murder, as long as the consequential crime was a "foreseeable consequence" of the armed robbery. In *Claudio*, the felony murder resulted after the defendants agreed to commit a robbery at knifepoint. In *Hooks*, the felony murder was accomplished when the defendants agreed to commit an armed robbery and then shot a store clerk with a handgun.

In this case, the homicide occurred during an attempted robbery that was committed by two masked men who each discharged the gun he was carrying. We adhere to our holdings in *Claudio* and *Hooks*. The instructions to the jury at Hassan–El's trial correctly stated those well-established provisions of the Delaware law, which were applicable at the time.

### Section 3507 Violation Harmless Error

■ Zayas testified as a witness for the State. He testified that Guy and Hassan–El told him they planned to rob the ice cream man. Zayas testified that he was an eyewitness to the shooting. Zayas' testimony also touched on an "interview" between Zayas and the Wilmington Police which occurred on July 24, 2001.

Before the jury heard Zayas' out-of-court statement, the defense objected to its admissibility. According to Hassan–El's attorney, the statement was outside the scope of title 11, section 3507 of the Delaware Code [24] because it was a videotape of a police interrogation of Zayas, as opposed to a "voluntary statement." The trial judge overruled the defense's objection but gave the jury a limiting instruction.

The issue presented by Hassan–El is whether a "voluntary statement of a witness" under section 3507 includes the "give and take" that occurs between a police interrogator and a suspect/witness during the course of an interrogation. Title 11, section 3507 of the Delaware Code provides:

(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

Hassan–El submits that "the videotape of Zayas' interrogation by the police, when viewed in its totality, allowed the jury to consider not just the content of what Zayas was saying to the police, but also impermissibly allowed the jury to hear and be influenced by statements by the police to Zayas where the police expressed their own opinions as to whether Zayas was being truthful with them." Hassan–El contends that allowing the jury to consider the opinions of the police when it assessed the credibility of the out-of-court statement takes the statement outside of the intended purpose of section 3507 and renders the statement inadmissible.

■ A "statement" is admissible under section 3507, provided a proper foundation is made, even though the "statement" would be inadmissible under the Delaware Rules of Evidence.[25] Neverthe-

---

24. Del.Code Ann. tit. 11, § 3507.

25. *Demby v. State*, 695 A.2d 1152, 1160–61 (Del.1997) (The enactment of the Delaware

Rules of Evidence did not affect section 3507.).

less, this Court has held that a "narrow interpretation" of the statute is required because of a defendant's constitutional right to confront and cross-examine witnesses providing testimonial evidence.[26] One type of statement that is beyond the scope of section 3507 is an "interpretive narrative:"

> The Statute admits as affirmative evidence "the voluntary out-of-court prior statement of a witness." It is the statement of the declarant that is being admitted, not the interpretative narrative of the person who heard the statement. Care should be taken to guarantee that the Statute is not abused by permitting a witness, such as a police officer, to embellish the prior statement by his own interpretation, even if the embellishment is made in the utmost good faith. Obviously, the best protection in this regard is a written statement.[27]

■ A corollary to the prohibition against using section 3507 to present an "interpretive narrative" is the well-established principle that a statement admitted under section 3507 must not include a police officer's opinion concerning the credibility of the witness.[28] In *Holtzman,* the jury viewed a videotaped interrogation of the defendant by the police. During the interrogation, the police officer expressed her personal belief that the defendant was guilty and that she believed the victim. This Court held that the police officer's statements in the interrogation concerning the credibility of the defendant were beyond the scope of section 3507 and, therefore, inadmissible.[29]

According to Hassan–El, the facts in his case are a mirror image of *Holtzman* because the police interrogation of Zayas is "replete" with statements by the police interrogators that they know what happened and whether Zayas was being truthful or untruthful with them:

> POLICE OFFICER: We've been workin' on this since it came in.... We know what the other people were doing and what they did.... [W]e know what happened.... [W]e know what your part was.

> POLICE OFFICER: We know you were there ... [a]nd we know the other people involved ... [a]nd that's why we need to know your specific part.... I know what you did.... I know what the other people did ... [a]nd you have to be honest with us.

> POLICE OFFICER: [B]ut you're leaving parts out. We know everything that happened. We have witnesses, we talked to witnesses. How do you think we came up with you?

> \* \* \*

> And we know what happened.... Now, I don't think you intended for Abdul to die.... I don't think you wanted that to happen.

> \* \* \*

> And I don't think you realized what these two guys were gonna do as far as kill him.... [Y]ou have to be honest with us and tell us everything ... because you haven't told us everything. We know the two other guys.... We

---

**26.** *Keys v. State,* 337 A.2d 18, 22 (Del.1975). *See also Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), *more recently explained in Hamdan v. Rumsfeld,* —— U.S. ——, ——, 126 S.Ct. 2749, 2798, 165 L.Ed.2d 723, 2006 U.S. Lexis 5185, at *133 (2006).

**27.** *Huggins v. State,* 337 A.2d 28, 29 (Del. 1975).

**28.** *See Holtzman v. State,* 1998 Del. Lexis 288, at *11–12 (Del.Supr.1998).

**29.** *Id.* at *5.

know them.... Today is your only chance.

POLICE OFFICER: I don't think you intended on killin' 'im.... And I know you didn't pull the trigger. I know that.... But you have to tell me your part, because we know what your part is.... Get it off your chest.... I know you're not a bad guy.... Ya have to talk to us and tell us the truth.

\* \* \*

[Y]ou have to tell us everything, because we know all the facts. We've been puttin' the puzzle all together.... We know what both o' them did, but we know which one actually did it.

\* \* \*

We know what you did, but you have to tell us.

POLICE OFFICER: Who were the two guys, Robert? C'mon, tell me ... who were the two guys?

ZAYAS: I don't know 'em, man!" I don't know 'em.

POLICE OFFICER: We know 'em. You're not gonna be tellin' us something we don't know, but we need to hear you say it.

\* \* \*

ZAYAS: I didn't have nothin' to do with it, man!

POLICE OFFICER: Who were the two guys? ... Don't tell me you don't know, 'cause I know you know.

\* \* \*

POLICE OFFICER: Can you identify them?

ZAYAS: No.

POLICE OFFICER: You're a liar.

\* \* \*

POLICE OFFICER: What's his name?

ZAYAS: I don't know.... I think its "T.Y." or something like that.

POLICE OFFICER: [Y]ou're doin' fine. OK? Robert, you're doin' fine.... But you have to do a little bit better to help yourself out.

\* \* \*

POLICE OFFICER: Give us his name. We know you know 'im. God! I'm tired to throwin' you so many hints.

\* \* \*

POLICE OFFICER: We know that the other guy you're probably more afraid of ... [b]ecause we know what the other guy does ... [a]nd we know he's that kind of person.... OK? I know what's goin' on here. We know the other guy.

POLICE OFFICER: [T]ell me the two guys' names. And don't tell me you don't know now. No more o' that! Tell me the two guys' names now.

ZAYAS: It was T.Y. and some boy named Ak, I think.

POLICE OFFICER: Ak. A'ight. We're making progress. You're not finished with Ak's name.

In this appeal, Hassan–El contends that all of the foregoing excerpts from Zayas' interrogation served to enhance Zayas' credibility with the jury because the jury was told that what Zayas told the police about the involvement of Hassan–El and Guy was consistent with what the police already "knew" concerning the identity of the persons who shot the ice cream man.

After the jury saw the videotape, the trial judge gave the following instruction to the jury:

Ladies and Gentlemen, I have to give you this instruction concerning the tape that you just heard. On the tape, you've heard Detective Lawson, as well as the other detective who was there, say on numerous occasions words something to the effect we know who was involved; we know who did it; we know who fired the gun. These statements and others

that are similar like them that were made by the detectives are investigative techniques that are frequently used by the police in questioning possible suspects or witnesses. Those statements that are made by the police are not evidence and are not reflective of whether or not anyone is guilty. And you should not give any weight whatsoever to those particular statements. They were simply an investigative technique used by the police. You are, however, free to consider the actions taken by the police in assessing the credibility of the statements made by the witness and in determining the weight you believe should be given to this witness' statements.

■ Hassan–El acknowledges the general rule that a limiting or curative instruction is usually sufficient to remedy any prejudice that results when admissible but prejudicial evidence is properly presented or inadmissible evidence is erroneously presented to a jury.[30] Nevertheless, Hassan–El argues that the curative instructions given in his case were insufficient to remedy the resulting prejudice.[31] Given the strength of the State's case, however, we disagree.

We hold that the questions and statements by the police were beyond the scope of section 3507 and should have been excluded.[32] Just a few months ago, we held that the State's argument that the jury needed to see the whole videotape to understand the full context of the questioning is "lacking in substance." [33] The only evidence permitted by section 3507 is the "voluntary out-of-court prior statement of a witness who is present and subject to cross-examination." [34]

■ The admission of the police statements and questions requires reversal of Hassan–El's convictions unless it was "harmless beyond a reasonable doubt." [35] The State has the "burden of showing the absence of prejudice." [36] Although the State did not argue harmless error in its Answering Brief, we have the discretion to consider that issue *sua sponte*.[37] In this appeal, we directed the parties to brief the question of harmless error prior to hearing oral argument *en Banc*.

■ The best way to properly present section 3507 evidence is by a written statement from the declarant [38] or a redacted recorded statement of only the declarant's words. Nevertheless, in view of the limiting instruction, and the strength of the State's case, the admission of the police statements and questions was harmless beyond a reasonable doubt.[39] Accordingly, we hold that error did not deprive Hassan–El of a fair trial.

**30.** *Zimmerman v. State*, 628 A.2d 62, 65 (Del. 1993).

**31.** *See Weddington v. State*, 545 A.2d 607, 612 (Del.1988). *See also State v. Savage*, 2002 WL 187510, at *3–4, 2002 Del.Super. Lexis 71, at *9–10 (Del.Super.Ct. Jan. 25, 2002) (curative instruction insufficient to remedy error caused by police witness vouching for credibility of informant).

**32.** *Miller v. State*, 893 A.2d 937, 950–52 (Del. 2006).

**33.** *Miller v. State*, 893 A.2d at 951, n. 49.

**34.** Del.Code Ann. tit. 11, § 3507.

**35.** *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**36.** *United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

**37.** *See United States v. McLaughlin*, 126 F.3d 130, 135 (3d Cir.1997).

**38.** *Keys v. State*, 337 A.2d 18, 23 (Del.1975).

**39.** *Van Arsdall v. Delaware*, 524 A.2d 3 (Del. 1987).

### Conclusion

The judgments of the Superior Court are affirmed.[40]

---

40. The prior panel opinion issued on July 13, 2006 is withdrawn.