**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 19, 2023

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 19, 2023

*Erin L. Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | |
| Respondent, | No. 99793-4 |
| v. | En Banc |
| TYLER TERELL BAGBY, | Filed: January 19, 2023 |
| Petitioner. | |

PER CURIAM[1]—The court unanimously holds that two elements of the prosecutor's conduct objectively constituted a flagrant or apparently ill-intentioned appeal to jurors' racial bias in a way that undermined the defendant's credibility and presumption of innocence. Because the race-based misconduct was so flagrant and ill intentioned that a timely objection and jury instruction could not have cured resulting prejudice, the errors are per se prejudicial, warranting reversal.

The two elements of the prosecutor's misconduct constituting reversible error were repeated use of the term "nationality" to distinguish the defendant, a Black man who is a United States citizen, from

---

[1] This court may issue a per curiam opinion summarizing the votes of the justices in a plurality decision, preceding the lead opinion. Wash. Sup. Ct. Internal R. II-8(B).

other witnesses, all but one of whom are not Black, and framing of several white witnesses as "Good Samaritans" while conspicuously excluding the sole Black witness, who notably tried to deescalate the first incident at issue.

In the lead opinion, four justices—Montoya-Lewis, J., González, C.J., and Yu and Whitener, JJ.—would additionally hold that the prosecutor committed misconduct by questioning a witness about the defendant's dog. However, five justices—Stephens, Johnson, Madsen, Owens, and Gordon McCloud, JJ.—hold, in a concurring opinion, that the record in this case does not support the conclusion that this conduct was reversible error.

The decision of the Court of Appeals[2] is reversed, and the case is remanded to the trial court for a new trial.

---

[2] *State v. Bagby*, No. 36530-1-III (Wash. Ct. App. April 20, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/365301_unp.pdf.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 19, 2023

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 19, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 99793-4 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | EN BANC |
| | ) | |
| TYLER TERELL BAGBY, | ) | |
| | ) | Filed: January 19, 2023 |
| Petitioner. | ) | |
| _____ | ) | |

MONTOYA-LEWIS, J.—Tyler Terell Bagby was convicted of residential burglary, fourth degree assault, and harassment. At his trial, the prosecutor repeatedly asked witnesses to identify Bagby by his "nationality." All the witnesses responded by identifying Bagby as either Black or African-American. Bagby was born in the United States; he is an American citizen; and his race, ethnicity, and identity were not at issue in this case. We granted review to address whether a prosecutor's repeated use of the word "nationality," among other statements, to distinguish a defendant from other witnesses evokes racial bias in a manner that constitutes prosecutorial misconduct and prejudices the trial. We hold that it does.

The prosecutor's use of the term "nationality" and other comments

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

unnecessarily emphasized Bagby's race during his trial. Here, we apply the heightened standard for race-based prosecutorial misconduct claims and consider the facts through the lens of an objective observer in light of our recent decision in *State v. Zamora*.[1] We conclude the prosecutor's conduct in Bagby's case was a flagrant or apparently intentional appeal to racial bias in a way that undermined Bagby's credibility and his presumption of innocence. The prosecutor's improper conduct constituted prosecutorial misconduct that is per se prejudicial. Accordingly, we reverse and remand to the trial court for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

### A. The Incident

In the late-evening hours of February 3, 2018, Tyler Bagby went to a fraternity party with his three friends: Solomon Cooper, Shyla Roberson, and Kailah Crisostomo. At the time, the four were enrolled students at nearby universities. Crisostomo and Bagby had been dating for a couple of weeks, but that night was the first time Crisostomo met Roberson and Cooper. The group spent the evening drinking at Bagby's home before walking down the street to a crowded fraternity party where they continued to drink, dance, and socialize.

Sometime after midnight in the early morning hours of February 4,

---

[1] 199 Wn.2d 698, 717, 512 P.3d 512 (2022).

Crisostomo separated from Bagby at the party. When she did not return, Bagby asked Roberson to check on her. Shortly thereafter, Roberson found Crisostomo in the fraternity's gender-neutral bathroom crying hysterically and saying she did not want to go back to Bagby. In response, Roberson offered to let Crisostomo come back to her home.

When neither of the women returned, Bagby became concerned and went to look for them. He found them in the same bathroom stall and asked them what was going on. When Roberson insisted that he leave and that she would take Crisostomo home, Bagby became angry and began to yell and shake the stall door. When Austin Davis, a bystander, intervened and attempted to get Bagby to leave the bathroom, Bagby punched Davis, knocking him unconscious. Cooper eventually came to the bathroom and removed Bagby from the party. Two witnesses, Sabrina Manzo and Leann Griffith, were present in the bathroom as these events unfolded.

After Bagby and Cooper left the party, Roberson and Crisostomo also left and walked toward Roberson's apartment. While the two women were walking, Roberson called the police to report what had occurred at the fraternity party. Shortly after they arrived at Roberson's apartment, Crisostomo fell asleep on the couch. Over the next 40 minutes, Bagby attempted to contact Roberson by calling her and sending her messages through social media. Eventually, he sent her an insulting message and then left the following voice message:

> (Inaudible) when I see you I will break your fucking jaw, because you just made me look like a fucking (inaudible) with my friends and I'm not bullshitting with you. Get a restraining order against me now, because again when I come to you, I will fuck you up, when I see you.

1 Verbatim Rep. of Proc. (VRP) (Nov. 26, 2018) at 140.

Approximately 10 minutes after Bagby left the voice message, he arrived at Roberson's apartment, forced the door open, entered the apartment, and began yelling at Crisostomo. Roberson called the police for the second time while yelling for Bagby to get out. As Bagby attempted to talk to Crisostomo, she woke up and retreated to the bedroom.

Two others—Elizabeth Nelson, who was walking past Roberson's apartment building, and Daniel Robinett, who lived in the unit above Roberson's—heard shouting and went to Roberson's apartment to investigate. Police officers arrived several minutes later and found Bagby standing outside of the apartment building, where they arrested him.

B.     Trial

Bagby was charged with residential burglary, fourth degree assault, third degree malicious mischief, and harassment. The case was tried to a jury over two days. Bagby was the only Black person at his trial other than his friend, Cooper. The judge, the lawyers, nearly all of the witnesses, and the entire jury panel were white.

At trial, the prosecutor called several witnesses to testify about what they saw during the incidents that occurred on February 4. In doing so, the prosecutor

*State v. Bagby*
No. 99793-4

repeatedly asked witnesses to identify Bagby by his "nationality."

For example, the prosecutor asked Manzo, "And the gentleman talking to the women in the stall trying to get his girlfriend out, what was his nationality?" *Id.* at 79. Manzo identified him as "African American." *Id.* In response, the prosecutor proceeded, "[A]nd then the gentleman that came up to talk to him, what was his nationality?" to which she responded, "He looked white." *Id.* at 80. The prosecutor proceeded to refer to the individuals identified as "the white guy" and "the [B]lack guy" during his direct examination of Manzo and continued to ask about the "nationality" of "those men" as Manzo described additional individuals involved. *Id.* at 79-81.

The prosecutor similarly questioned Griffith, "Did you ever pay attention to his nationality or anything else?" *Id.* at 94. When she responded no, the prosecutor clarified that he was asking about "[e]thnicity." *Id.* In response, she added, "He was [B]lack, I think." *Id.* Later, Griffith was asked if she "recognize[d] the ethnicity of that guy?" in reference to Davis. *Id.* at 95. Griffith responded, "He was white." *Id.* Then, she was asked to clarify if that was "the person that was talking to the African American man?" *Id.* at 96. The prosecutor then clarified a second time, "And again, we're talking, the white guy did not push[,] touch[, or] hit the [B]lack guy he was talking to?", and Griffith responded in the affirmative. *Id.* at 97. The prosecutor continued to ask witnesses to describe what they saw by identifying the people

5

*State v. Bagby*
No. 99793-4

involved by their race over a dozen times.

Throughout trial, neither party objected to questions or remarks about nationality, race, or ethnicity. Defense counsel also asked the witnesses to refer to the individuals involved by their nationality when describing what had occurred the night of the incidents. Both the prosecutor and defense counsel asked the witnesses about other individuals involved in the incidents using other identifying characteristics, such as hair color. Davis was frequently referred to as the "guy with the red hair." *Id.* at 88, 89, 103, 104, 121. But, aside from the prosecutor's questions about his "nationality," Bagby's citizenship status was not part of the facts of the case.[2] From the start of trial, Bagby's identity was not at issue and he did not deny that he was the person involved in the relevant incidents. Rather the defense's theory at trial was self defense and diminished capacity by voluntary intoxication. The only issue at trial was whether his conduct constituted a crime.

On cross-examination, the prosecutor also questioned Bagby at length about his relationship with his dog. The prosecutor began by asking Bagby if Roberson had ever watched his dog for him, and then proceeded:

> [STATE]: How long have you had that dog?
> [BAGBY]: I got my dog in August of 2017, so that makes him about a year and a half now, his birthday is June 11th.
> [STATE]: So, he would have been a puppy when she knew him?
> [BAGBY]: Yes.

---

[2] Bagby is an American citizen. He testified that he was born in California. 1 VRP (Nov. 27, 2018) at 220.

6

*State v. Bagby*
No. 99793-4

> [STATE]: For six months?
> [BAGBY]: That's [why] she watched him.
> [STATE]: Okay. All right. Still have your dog?
> MR. BAGBY: Yes, I do.
> [STATE]: Love him?
> [BAGBY]: Of course.
> [STATE]: Care about him deeply?
> [BAGBY]: Who has a dog for over a year and don't care about him? Yes, I do.
> [STATE]: Unfortunately, some people [don't]; but I'm glad to hear you're not one of them.

2 VRP (Nov. 27, 2018) at 261-62. The prosecutor's fixation on whether Bagby cared about his dog was peculiar considering that there was no dog involved at the incident at the party or at Roberson's apartment and that Bagby's dog was irrelevant to the events that occurred that night.

In closing arguments, the prosecutor framed his argument around the theme, "This is a case with a bunch of [G]ood [S]amaritans. Mr. Bagby wasn't one of them." *Id.* at 306-07. He proceeded to identify each witness one by one—Roberson, Davis, Manzo, Griffith, Nelson, and Robinett—as "[G]ood [S]amaritans." *Id.* at 306-08. The prosecutor did not, however, identify Cooper—the person who helped remove Bagby from the party and who tried to deescalate the situation—as a Good Samaritan. Cooper, like Bagby, is Black. 1 VRP (Nov. 27, 2018) at 232. The prosecutor described those other witnesses as "just regular folks who are going about their day hoping to have a good time at the party." 2 VRP (Nov. 27, 2018) at 352.

The prosecutor also repeatedly referred to Nelson and Robinett, two white

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

witnesses, as "citizens," despite a lack of evidence in the record or other discussion regarding their citizenship status:

> Then you go on to Ms. Roberson's apartment . . . . After [Bagby] kicks in the door and she's screaming get out, get out of my house, two other citizens hear; one citizen from upstairs, as her neighbor upstairs, they didn't know each other. . . . [Nelson and Robinett] both heard it. They were both concerned. And as [G]ood [S]amaritans they as good citizens they went on down there and tried to get Mr. Bagby to leave.

*Id.* at 308.

The jury found Bagby guilty of residential burglary, fourth degree assault, and harassment but not guilty of malicious mischief. The trial court imposed a sentence within the standard range.

C.    Procedural History

Bagby appealed his convictions. He argued the prosecutor's use of race and the term "nationality" evoked racial bias in a manner that constituted prosecutorial misconduct and negatively impacted his trial, requiring reversal of his convictions. The State conceded that its use of the term "nationality" was incorrect but argued that it was not an intentional appeal to racial bias. The State reasoned that raising the issue of race was necessary and appropriate to help the witnesses who did not know Bagby to identify him. Thus, the State claimed, such questioning did not rise to prosecutorial misconduct, and even if it had, the error would have been harmless in light of the substantial evidence against Bagby.

The Court of Appeals rejected Bagby's arguments and affirmed the trial court.

8

*State v. Bagby*
No. 99793-4

Although the court cited the test for race-based prosecutorial misconduct from *State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011),[3] it focused on whether Bagby had successfully overcome his failure to timely object at trial. The Court of Appeals reasoned this burden required Bagby to demonstrate that the prosecutor's conduct was so "flagrant and ill intentioned" that a curative instruction would not have alleviated the resulting prejudice. *State v. Bagby*, No. 36530-1-III, slip op. at 8 (Wash. Ct. App. Apr. 20, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/365301_unp.pdf. In considering whether the prosecutor had appealed to racial bias, the Court of Appeals reasoned the prosecutor had misused the term "nationality" in an attempt to establish Bagby's identity and that questions about Bagby's dog were merely "awkward" attempts to build rapport during questioning. *Id.* at 10. Ultimately, the court concluded that such conduct did not play into racial bias when viewed in context and so the prosecutor's actions did not constitute "flagrant and ill-intentioned" misconduct. The court also determined that Bagby's failure to object during trial precluded any relief.

Bagby petitioned for review in this court, renewing his previous arguments. We granted review and accepted briefs of amici curiae filed in support of Bagby

---

[3] When a prosecutor flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence, their conduct is considered per se prejudicial, and reversal of the defendant's convictions is required. *Zamora*, 199 Wn.2d at 709 (citing *Monday*, 171 Wn.2d at 680).

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

from the Fred T. Korematsu Center for Law and Equality as well as the Black Law Students Associations of the University of Washington and Gonzaga University.

ANALYSIS

I.    The Right to an Impartial Jury and Prosecutorial Misconduct Claims

A criminal defendant is guaranteed the right to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution as well as article I, section 22 of the Washington State Constitution. The promise of an impartial jury requires that the jury be unbiased and unprejudiced. *State v. Berhe*, 193 Wn.2d 647, 658, 444 P.3d 1172 (2019) (citing *Alexson v. Pierce County,* 186 Wash. 188, 193, 57 P.2d 318 (1936)). "[A]llowing bias or prejudice by even one juror to be a factor in the verdict violates a defendant's constitutional rights and undermines the public's faith in the fairness of our judicial system." *Id.*  A defendant is deprived of their right to an impartial jury "when explicit or implicit racial bias is a factor in a jury's verdict." *Id.* at 657. As the United States Supreme Court has also acknowledged, permitting racial prejudice in the jury system damages "'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 137 S. Ct. 855, 868, 197 L. Ed. 2d 107 (2017) (quoting *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.

*State v. Bagby*
No. 99793-4

Ct. 1364, 113 L. Ed. 2d 411 (1991)).

As we have previously and repeatedly acknowledged, prosecutors play a special role in ensuring the integrity of our justice system. They not only serve in a quasi-judicial role as an officer of the court but they also serve as a representative of the people with the duty to seek impartial justice for both the guilty and the innocent. *Monday*, 171 Wn.2d at 676 (citing *State v. Case*, 49 Wn.2d 66, 70-71, 298 P.2d 500 (1956)). Thus, defendants are among the people the prosecutor represents, and, as such, prosecutors have a special duty to ensure that the defendant's rights to a fair trial are not violated. *Id.* A defendant's right to an impartial jury under article I, section 22 of the Washington State Constitution is "gravely violate[d] . . . when the prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions"—such convictions undermine the integrity of our entire criminal justice system. *Id.* at 676, 680.

Generally, a defendant alleging prosecutorial misconduct must make a timely objection and demonstrate that "the prosecutor's 'conduct was both improper and prejudicial in the context of the entire trial'" for a reversal. *Zamora*, 199 Wn.2d at 708 (internal quotation marks omitted) (quoting *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). Under this test, "the prosecutor's improper comments are prejudicial 'only where there is a substantial likelihood the misconduct affected the jury's verdict.'" *Monday*, 171 Wn.2d at 675 (emphasis and internal quotation marks

11

omitted) (quoting *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007)). If the defense fails to timely object to the claimed misconduct, then reversal is not required unless the defendant can show that "the prosecutor's improper and prejudicial conduct was 'so *flagrant and ill intentioned* that [a jury] instruction would not have cured the [resulting] prejudice.'" *Zamora*, 199 Wn.2d at 709 (emphasis added) (alterations in original) (internal quotation marks omitted) (quoting *Loughbom*, 196 Wn.2d at 70).

However, we look to a different test when the alleged misconduct involves claims of racial bias. The standard for race-based prosecutorial misconduct is heightened to ensure there is no constitutional violation. *See Monday*, 171 Wn.2d at 680. In this context, the test is as follows: when a prosecutor *flagrantly or apparently intentionally* appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence, their improper conduct is considered per se prejudicial, and reversal of the defendant's convictions is required. *Zamora*, 199 Wn.2d at 715; *see Monday*, 171 Wn.2d at 680.

The parties in this case have similarly framed the primary issue as a question of whether the prosecutor's use of the term "nationality," among other comments, constitutes "*flagrant and ill-intentioned*" misconduct, relying on language that comes from the test for analyzing *general* prosecutorial misconduct claims. The theme of intentionality plays a heavy role in their analysis. Bagby argues the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Bagby*
No. 99793-4

prosecutor intentionally used the term "nationality" to draw the jury's attention to Bagby's race to evoke racial biases against Black defendants. The State counters that the prosecutor's remarks cannot be considered "ill intentioned" because the *purpose* of the prosecutor's remarks was merely to assist witnesses to identify Bagby. The Court of Appeals similarly centered its analysis on the prosecutor's claimed intent—allowing witnesses to identify Bagby and building rapport—and ultimately concluded that the prosecutor's questions did not reflect racism or stereotypes in a manner that constituted "flagrant or ill-intentioned misconduct." *Bagby*, No. 36530-1-III, slip op. at 10-11.

However, the requirement to demonstrate that a prosecutor's conduct is "flagrant and ill intentioned" is distinct from the "flagrant or apparently intentional" standard we declared in *Monday. Zamora*, 199 Wn.2d at 709; *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 832-34, 408 P.3d 675 (2018) (applying the different standards when analyzing the prosecutor's racial comments versus nonracial comments). In this case, the parties and the Court of Appeals erred by anchoring their analyses to the "flagrant and ill-intentioned" standard that stems from general prosecutorial misconduct cases. We take this opportunity to clarify and reiterate that, after *Monday*, prosecutorial misconduct claims involving racial bias are controlled by the "flagrant or apparently intentional" standard. 171 Wn.2d at 680. Thus, to prevail on a claim of race-based prosecutorial misconduct, the defendant must

13

demonstrate that the prosecutor's conduct was both improper and prejudicial by showing that they *flagrantly or apparently intentionally* appealed to racial bias in a manner that undermined the defendant's credibility or the presumption of innocence. *Id.*; *Zamora*, 199 Wn.2d at 709. If the prosecutor's conduct flagrantly or apparently intentionally appealed to racial or ethnic bias, then their improper conduct is considered per se prejudicial and reversal is required. *Zamora*, 199 Wn.2d at 715.

Most recently, we applied this standard in *Zamora*, a case involving a defendant of Latinx ethnicity and United States citizenship. *Id.* at 713 (majority), 723 (Gonzalez, C.J., concurring). During the one-hour voir dire examination, the prosecutor asked potential jurors at least 10 times about their views on unauthorized immigration, crime at the border, and border security, and he continually returned to these topics throughout the questioning. *Id.* at 719. The nature of the facts and the underlying alleged crime had nothing to do with immigration or border security. *Id.* We applied the "flagrant or apparently intentional" standard and determined the remarks about immigration and border security were irrelevant and unnecessarily politicized jury selection. *Id.* at 709, 714. Although the prosecutor's conduct did not include an express mention of the defendant's ethnicity as Latinx, we concluded that when viewed in context, the prosecutor improperly linked the defendant's ethnicity to jurors' potential racial and ethnic bias, stereotypes, and prejudices about people of Latinx descent. *Id.* at 715.

*State v. Bagby*
No. 99793-4

Bagby alleges the prosecutor tied the case to Bagby's nationality, race, and ethnicity through his repeated questioning about those topics. Accordingly, we apply the heightened "flagrant or apparently intentional" standard to Bagby's case to further examine whether the prosecutor's reliance on nationality, race, and ethnicity was improper and constituted prosecutorial misconduct. *Id.* at 709; *Monday*, 171 Wn.2d at 680.

## II.  Intent and the Objective Observer Standard

The State argues we should conclude the prosecutor's questions and comments were not improper because the prosecutor's conduct was race neutral and not intentionally designed to discredit Bagby based on his race. This argument calls for an evaluation of what was in the mind of the prosecutor to determine whether they "flagrantly or apparently intentionally" appealed to jurors' racial bias. Effectively, the State's argument requires that we interpret "flagrantly or apparently intentional" appeals to jurors' racial bias using a subjective intent-based standard.

However, subjective intent is not considered in race-based prosecutorial misconduct claims. *Zamora*, 199 Wn.2d at 716 (quoting *Loughbom*, 196 Wn.2d at 76). The question of whether a prosecutor flagrantly or apparently appealed to jurors' racial bias is analyzed using an objective lens. *Id.* at 717-18. This is consistent with our approach in general prosecutorial misconduct claims; in that context, we have stated that the prosecutor's "'reasonable intentions' are irrelevant because we

15

*State v. Bagby*
No. 99793-4

do not assess a prosecutor's subjective intent when deciding whether error occurred." *Loughbom*, 196 Wn.2d at 76 (citing *State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976 (2015)). Relying on an inquiry based on the prosecutor's intent would fail to adequately recognize how both explicit and implicit racial bias can undermine the integrity and fairness of a jury's verdict.

First, focusing on the prosecutor's subjective intent would fail to detect any implicit biases potentially at play. As we acknowledged in *Berhe*,

> [R]acial bias is a common and pervasive evil that causes systemic harm to the administration of justice. Also unlike other types of juror misconduct, racial bias is uniquely difficult to identify. Due to social pressures, many who consciously hold racially biased views are unlikely to admit to doing so. Meanwhile, implicit racial bias exists at the unconscious level, where it can influence our decisions without our awareness.

193 Wn.2d at 657. It is not possible for courts to "simply ask the person about [their implicit biases] and assess the credibility of [their] response because 'people are rarely aware of the actual reasons for their discrimination and will genuinely believe the race-neutral reason they create to mask it.'" *Id.* at 663-64 (citing *State v. Saintcalle*, 178 Wn.2d 34, 49, 309 P.3d 326 (2013) (plurality opinion)). Even if a court were to ask a prosecutor, they would unlikely acknowledge, or perhaps even know, whether their conduct involved their implicit biases. Thus, any analysis of prosecutorial misconduct that relies on subjective intent would likely require egregious and explicit bias in order for the courts to detect it. *See id.* at 664.

16

State v. Bagby
No. 99793-4

Second, focusing on the prosecutor's intent also ignores the impact of racial

bias on the jury even where it plays a significant role. *See id.* In practice, a finding

that the prosecutor did not actually intend to discriminate would end the inquiry

without judicial review of whether the prosecutor's conduct implicitly influenced

the jury to improperly consider race. *Id.* Such a result would inhibit our courts in

their duty to "be vigilant of conduct that appears to appeal to racial or ethnic bias,

even when not expressly referencing race or ethnicity." *Zamora*, 199 Wn.2d at 714.

For these reasons, relying on an inquiry based on the prosecutor's subjective intent

would unlikely correct the pervasive evils of all forms of racial bias. *See Berhe*, 193

Wn.2d at 664.

Therefore, in contrast to a subjective intent perspective, we apply the

objective observer standard when analyzing claims of prosecutorial misconduct

involving racial bias.[4] *Zamora*, 199 Wn.2d at 717-18. We are concerned with the

impact of racial bias—not a person's intent. Accordingly, to determine whether the

prosecutor's conduct in this case flagrantly or apparently intentionally appealed to

jurors' potential racial bias, we ask whether an objective observer[5] could view the

---

[4] We have adopted the objective observer standard to evaluate race-based juror misconduct, *Berhe*, 193 Wn.2d at 665, as well as jury selection practices. *State v. Jefferson*, 192 Wn.2d 225, 249-50, 429 P.3d 467 (2018) (plurality opinion); *see* GR 37(f). We extended this standard to include claims of prosecutorial misconduct involving racial bias in *Zamora*, 199 Wn.2d at 717-18.

[5] An "objective observer" is an individual who is aware of the history of race and ethnic discrimination in the United States and that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State. *Berhe*, Wn.2d at 664-65 (quoting GR 37(f)).

17

*State v. Bagby*
No. 99793-4

prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence.[6] *Id.*

### III. Applying the Objective Observer Standard to Bagby's Case

With this analysis, we conclude that the prosecutor's conduct apparently appealed to racial bias and violated Bagby's right to a fair trial. Under this objective observer standard, we consider the content and subject of the statements, the frequency of the remarks, the apparent purpose of the statements, and whether the comments were based on evidence or reasonable inferences in the record. *Zamora*, 199 Wn.2d at 718-19; *see Monday*, 171 Wn.2d at 678.

In *Zamora*, the content and subject of the prosecutor's statements revolved around unauthorized immigration, crime at the border, and border security. *Zamora*, 199 Wn.2d at 719. The remarks were not one-off, isolated incidents but, rather, were frequent and repeated. *Id.* Within a one-hour time frame, the prosecutor returned to those topics no less than 10 times. *Id.* The case brought against Zamora—who was on trial for allegedly assaulting a police officer, despite being beaten nearly to death—was not remotely related to those topics, as border security, drug smuggling, or immigration could not legitimately be tied to any evidence in the record. *Id.* We

---

[6] The concept of an "objective observer" is consistent with the language of "apparently intentional" because the operative word "apparently" removes the focus from the actor's subjective viewpoint and shifts it to a third-party viewer to whom the intent is apparent.

18

*State v. Bagby*
No. 99793-4

concluded the apparent purpose of the prosecutor's remarks was to highlight the defendant's perceived ethnicity and link it to the worst kinds of racist stereotypes that the prosecutor had introduced about the Latinx community. *Id.*

Here, we apply the same framework to examine the prosecutor's statements in Bagby's case: we consider (1) the content and subject of the questions and comments, (2) the frequency of the remarks, (3) the apparent purpose of the statements, and (4) whether the comments were based on evidence or reasonable inferences in the record. *Zamora*, 199 Wn.2d at 718-19; *see Monday*, 171 Wn.2d at 678.

We analyze these factors with an understanding about the nature of racial bias as it pertains to nationality and race. *See Berhe*, 193 Wn.2d at 664-65 (quoting GR 27(f)). As we have acknowledged, "Not all appeals to racial prejudice are blatant. . . . Like wolves in sheep's clothing, a careful word here and there can trigger racial bias." *Monday*, 171 Wn.2d at 678. Biases are often activated through the use of coded language or racial code words such as phrases or symbols that "play upon race . . . [and] white Americans' negative views of [B]lack Americans— without explicitly raising the race card." andré douglas pond cummings, *Racial Coding and the Financial Market Crisis*, 2011 UTAH L. REV. 141, 217. When prosecutors utilize racially coded language, jurors respond with their own "latent biases." Praatika Prasad, Note, *Implicit Racial Biases in Prosecutorial Summations:*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Proposing an Integrated Response*, 86 FORDHAM L. REV. 3091, 3101 (2018). Coded language often involves themes or euphemisms that evoke a conception of "us" versus "them." *E.g.*, *id.* at 3104-09. Terms such as "'them,' 'these people,' and 'not like us'" "highlight the difference between the jurors and Black defendants" and suggest that Black defendants are inherently different from white jurors and deserve less sympathy, thus interfering with jurors' ability to properly weigh evidence. *Id.* at 3108 (footnotes omitted); Mikah K. Thompson, *Bias on Trial: Toward an Open Discussion of Racial Stereotypes in the Courtroom*, 2018 MICH. ST. L. REV. 1243, 1257 (2018). Studies have shown that even the simplest racial cues can trigger implicit biases and affect the way jurors evaluate evidence and "'subtle manipulations'" of a defendant's background—such cues can affect juror decision-making more so than even explicit references to race. Prasad, *supra*, at 3101. By calling attention to Bagby's "nationality," the prosecutor played into a stereotype that to be American is to be white and to be Black is somehow "foreign." *See* Claire Jean Kim, *President Obama and the Polymorphous "Other" in U.S. Political Discourse*, 18 ASIAN AM. L.J. 165, 168, 170 (2011).

Here, when the prosecutor continuously referred to Bagby's nationality, ethnicity, and race, it primed the all-white jury to pay more attention to this racial difference, thereby activating any anti-Black implicit biases they may hold. First, the prosecutor asked nearly every witness about Bagby's nationality. Although Bagby's

"nationality" is American, all of the witnesses responded that he is African-American or Black, having interpreted the prosecutor's question as referring to Bagby's race. This not only conflated the distinct concepts but also drew needless attention to the defendant's race. Also, at one point, the State asked a witness, "And the defendant punched the white guy that was talking to him?" 1 VRP (Nov. 26, 2018) at 81. With another witness, the prosecutor reiterated, "And again, we're talking, the white guy did not push[,] touch[, or] hit the [B]lack guy he was talking to?" *Id.* at 97. Identifying Bagby as the Black man and Davis as the white man in opposition to one another in this manner further emphasizes the idea of a racially charged "us" versus "them" mentality. *See* Prasad, *supra*, at 3107-08. Creating this racial distance in which Bagby, identified as the Black man, as the aggressor, primes the jury to consider the incident through that lens. *See id.* Additionally, in contrast to questions about Bagby's nationality, the prosecutor repeatedly used the term "citizens" to describe two white witnesses. 1 VRP (Nov. 26, 2018) at 10; 2 VRP (Nov. 27, 2018) at 308. Referring to citizenship and nationality in this manner further associated whiteness with being American and Blackness as un-American. *See* Kim, *supra*, at 168-70. The prosecutor's use of racial identifiers and frequent juxtapositioning of Black versus white further drew attention to Bagby's race as a factor in the trial.

Second, the State referred to Bagby's nationality and race frequently. The

*State v. Bagby*
No. 99793-4

State questioned witnesses about Bagby's "nationality" at least half a dozen times. 1 VRP (Nov. 26, 2018) at 79, 80, 94, 96, 97. The State also asked the witnesses to identify Bagby and other witnesses by their race over a dozen times. Thus, the number of times Bagby's race is brought up was not an isolated incident. *Monday*, 171 Wn.2d at 678.

Third, the apparent purpose of the State's use of the term "nationality" can be understood only as a way to emphasize Bagby's race. The State concedes that the prosecutor misused the term "nationality." However, the prosecutor's use of a more accurate term such as "ethnicity" or "race"[7] would have had the same result as it did here, where the prosecutor questioned the witnesses in a manner that elicited a reference to Bagby's race, thus repeatedly highlighting his race throughout trial. The fact that the prosecutor also used the term "nationality" to question witnesses about Davis's race does not minimize the impact of the repeated reference to Bagby's race throughout trial. This is simply because white Americans do not experience the same type of persistent negative stereotypes, biases, and prejudices that plague Black

---

[7] "Nationality" is defined as "[t]he relationship between a citizen of a country and the country itself, customarily involving allegiance by the citizen and protection by the state," and membership in a country, often citizenship status. BLACK'S LAW DICTIONARY 1234 (11th ed. 2019). "Race" is defined as "any one of the groups that humans are often divided into based on physical traits regarded as common among people of shared ancestry." MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/race (last visited Jan. 9, 2023). "Ethnicity" is "a particular ethnic affiliation of group." MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/ethnicity (last visited Jan. 9, 2023). Generally, race focuses on physical traits, while ethnicity is concerned with a group's cultural identity.

22

*State v. Bagby*
No. 99793-4

communities in this country. *See* Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. (June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7].

Fourth, the apparent purpose of the remarks about race and nationality was not to prove a relevant fact nor was it based on evidence in the record. Bagby is an American—his citizenship had absolutely nothing to do with the crimes he was charged with or the facts of the case. The State argues the purpose behind asking witnesses about Bagby's race was to help witnesses identify participants in the incident. However, the record does not support this explanation because Bagby's identity was not at issue in this case and he did not deny that he was the person involved in the relevant incidents; the only issue at trial was whether his actions constituted a crime. Moreover, the prosecutor should have used different methods of questioning to allow witnesses to identify Bagby and other witnesses using characteristics other than race. For instance, the prosecutor and defense counsel frequently referred to Davis by his hair color. The witnesses should have been posed broader questions to allow them to identify Bagby by numerous other identifying characteristics. Bagby's race had nothing to do with the crimes he was charged with or the facts of the case, and his race was not necessary to identify him since he had

23

conceded his involvement in the events underlying this case. Consequently, the apparent purpose of the prosecutor's remarks can only be explained as a method to emphasize Bagby's race.

The pattern of treating white witnesses differently from Black witnesses continued in closing arguments when the prosecutor framed his arguments around the theme of "[t]his is a case with a bunch of [G]ood [S]amaritans. Mr. Bagby wasn't one of them." 2 VRP (Nov. 27, 2018) at 306-07. He identified Roberson, Davis, Manzo, Griffith, Nelson, and Robinett as the Good Samaritans. The only witness the prosecutor did not identify as a Good Samaritan was Cooper, who was responsible for deescalating the situation in the fraternity bathroom and removing Bagby from the party. Cooper was the only Black witness. Like the remarks about nationality and race, the prosecutor repeatedly used the term "[G]ood [S]amaritan." *Id.* at 306-07. He did not use the term once in passing but deliberately singled out each white witness, one by one, identified them by name, and referred to each person as a good Samaritan. There was no apparent purpose based on the evidence in the record for why Cooper should have been singled out and excluded as a Good Samaritan. Compared to some of the other witnesses who were merely passive bystanders, Cooper located his friend as soon as he heard what had occurred in the bathroom, went there to deescalate the situation, and physically removed Bagby from the fraternity house. The only aspect that distinguishes him from the other witnesses is

*State v. Bagby*
No. 99793-4

the color of his skin. This is yet another example of how the prosecutor used subtle language to signal to the jury positive associations toward the white witnesses in juxtaposition with the one Black witness and the Black defendant involved in this case.

Additionally, the prosecutor continued to draw attention to Bagby's race through his questioning about Bagby's dog. Like the other actions by the prosecutor, an objective observer could view this line of questioning as an appeal to racial bias, given the content of the remarks, the frequency, the meager connection to the evidence, and the apparent purpose. *Zamora*, 199 Wn.2d at 717-18. At the start of Bagby's cross examination, the prosecutor asked him whether he loved his dog. When Bagby replied that he did love his dog, the prosecutor reiterated the question by asking whether he "[c]are[d] about him deeply." 2 VRP (Nov. 27, 2018) at 262. When Bagby assured him that he did, the prosecutor then responded with the statement, "Unfortunately, some people [don't]; but I'm glad to hear you're not one of them." *Id.* The prosecutor even asked Bagby whether he still has his dog, knowing that the dog was just a year and a half old. *Id.* at 261. During opening remarks, the prosecutor also stated that Davis, the man who Bagby had punched, intervened during the bathroom incident even though "he doesn't have a dog in the fight." 1 VRP (Nov. 26, 2018) at 13. Like the frequent references to nationality and race, the prosecutor's repeated follow-up questions about Bagby's dog cannot be dismissed

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

as a one-off comment.

The concurrence argues that the prosecutor inquired about dogs to demonstrate the relationship between Bagby and the victim and to show that Bagby trusted her enough to leave the dog with her for a short period of time. Thus, the concurrence states that the purpose of raising questions about the dog was to establish the credibility of a witness, not to prime the jury toward any racist inferences. However, the questioning about Bagby's dog was not based on relevant evidence in the record. No evidence about a dog was ever introduced at Bagby's trial; rather, this part of the record raises and connects Bagby to dogs for no apparent reason; if there was such a reason, as the concurrence suggests, that reason would have been identified and argued before the jury. The charges of burglary, assault, malicious mischief, and harassment did not involve a dog whatsoever.

As the concurrences note, the State asserts that it questioned Bagby about his dog ownership in an effort to demonstrate Roberson's credibility by suggesting that her friendship with Bagby must have been strong for him to have entrusted her with caring for his dog in the past. The State's assertion does not explain why it would be relevant to *repeatedly* ask Bagby about his love of the dog or whether he even still has the dog. It is difficult to explain this decision by the prosecutor to ask about the dog on multiple occasions when it had no relevance to the charges or facts of the

*State v. Bagby*
No. 99793-4

case whatsoever, nor can we conclude that the prosecutor's reasoning is based on a reasonable inference from the record.

As we have explained, under the objective observer standard, the inquiry is not about the prosecutor's claimed subjective intent to bolster the credibility of another witness; rather, we look to whether the prosecutor flagrantly or apparently intentionally appealed to racial bias in a way that undermines the defendant's credibility or the presumption of innocence. *Zamora*, 199 Wn.2d at 715; *see Monday*, 171 Wn.2d at 680. It is worth noting, stories about Michael Vick—a highly prominent Black former football quarterback, who was convicted for dog fighting— are still in the public consciousness.[8] Ann Linder, *The Black Man's Dog: The Social Context of Breed Specific Legislation*, 25 ANIMAL L. 51, 57-68 (2018) (discussing deep-seated prejudices involving dogs and Black and Latinx families). The prosecutor likely primed the jury to recall imagery associated with this story by commenting, "Unfortunately, some people [don't]" love their dogs. 2 VRP (Nov. 27, 2018) at 262. The jury was also likely primed to recall this story in light of the prosecutor's repeated mentioning and questioning of both Cooper and Bagby about Cooper's experience as a Washington State University football player. The questions

---

[8] This is where the concurrence misses the point about the relevance of the prosecution saying "he doesn't have a dog in the fight." 1 VRP (Nov. 26, 2018) at 13. The concurrence argues that this phrase alone is not a callback to racist tropes about Black men but rather a general reference to dogfighting and betting on the outcome of such now illegal dogfights. However, the phrase continues to prime the bias of the jurors after the repeated discussions of the defendant's dog, despite this being irrelevant to the case in any way.

27

*State v. Bagby*
No. 99793-4

about Bagby's dog evoke a harmful racial trope about Black men and their mistreatment of dogs. Kevin Blackistone, Opinion, *Black Men and Dogs: Don't Believe Vick*, NPR (Sept. 25, 2007);[9] Linder, *supra*, at 52-56 (2018) (discussing deep-seated prejudices involving dogs and Black and Latinx families). The suggestion that Black men mistreat dogs is a myth used to perpetuate the stereotype that Black men are dangerous and violent. *See* Blackistone, *supra.*

An objective observer—who is aware of the history of race and ethnic discrimination in the United States and that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State—could recognize the prosecutor's questioning about whether Bagby cared for his dog or even still has his dog as an allusion to stereotypes about Black men mistreating dogs. *See Zamora*, 199 Wn.2d at 718 (quoting *Berhe*, 193 Wn.2d at 665). This line of questioning whether Bagby was capable of keeping and caring for his dog evokes a harmful racial trope about Black men being too dangerous to properly treat dogs, undermining Bagby's credibility and presumption of innocence. The prosecutor's questioning about the dog could have evoked this harmful stereotype in the mind of the jurors and was irrelevant to crimes charged. If the prosecution intended to use the information about the dog to bolster the credibility of Roberson, it should have done so by explicitly stating its purpose in

---

[9] https://www.npr.org/templates/story/story.php?storyId=14698643.

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

asking about Babgy's dog and otherwise opining whether all dog owners love their dogs. The prosecution's failure to make its purpose clear in this line of questioning allows the jury to come to its own conclusions, and those conclusions could easily be based on the racist ideas about Black men and dogs.

An objective observer could conclude that this prosecutor's conduct was a flagrant or apparently intentional appeal to the jurors' potential racial biases in a way that undermined the defendant's credibility or presumption of innocence. The prosecutor's word choices and themes—his use of the term "nationality," his overemphasis on Bagby's race and its juxtaposition against white witnesses, and his questioning about Bagby's dog—were an apparently intentional attempt to distinguish Bagby based on his race. These themes were repeated throughout the course of the trial, and the objective observer could understand that the sheer volume of comments could have made it impossible for jurors to ignore the color of Bagby's skin, considering that these comments emphasized Bagby's race and the subtle connections these word choices have to negative stereotypes about Black communities. In light of the numerous instances of attention drawn to Bagby's race throughout the trial and the lack of connection those remarks had to the record in this case, an objective observer could conclude that the prosecutor had apparently intentionally reinforced the stereotype that Bagby, because he is Black, was more likely to have committed the crimes for which he was charged. Thus, we conclude

the prosecutor's questions and comments at trial were improper and constitute an apparently intentional appeal to jurors' potential racial bias in a way that undermined Bagby's credibility and presumption of innocence.

## IV. Prejudice

In *Monday*, we explained that once it has been determined that the prosecutor's conduct flagrantly or apparently intentionally appealed to racial bias, it then becomes the State's burden to prove that the prosecutor's race-based misconduct was harmless beyond a reasonable doubt. *Monday*, 171 Wn.2d at 680 (referring to "constitutional harmless error"). If the State fails to do so, then the defendant's convictions will be vacated. *Id.* Bagby and amici urge this court to instead adopt a "per se prejudice" rule to address instances when a prosecutor appeals to racial bias. Under such a rule, rather than analyzing the degree to which the prosecutor's conduct could have resulted in harm, we would conclude that a showing that the prosecutor engaged in flagrant or apparently intentional appeals to racial bias is per se prejudicial and thus the defendant's convictions must be vacated.

The harmless error analysis in *Monday* does not adequately address the challenge of quantifying and measuring the harm caused by racial bias. *Zamora*, 199 Wn.2d at 722. There is also an inherent conflict in the nature of harmless error analysis when it is applied to the context of addressing racial bias—if a prosecutor's flagrant or apparently intentional appeals to racial bias are inherently constitutionally

unfair, how can it also sometimes be harmless? As the *Monday* concurrence observed, "'[T]he right to a fair trial that is free of improper racial implications is so basic to the federal Constitution that an infringement upon that right can never be treated as harmless error.'" 171 Wn.2d at 683 (Madsen, C.J., concurring) (emphasis omitted) (quoting *Weddington v. State*, 545 A.2d 607, 614-15 (Del. 1988)). "Rather than engage in the unconvincing attempt to show the error here was not harmless, the court should hold instead that the prosecutor's injection of racial discrimination into this case cannot be countenanced at all, not even to the extent of contemplating to any degree that the error might be harmless." *Id.* at 682 (Madsen, C.J., concurring). As we acknowledged in *Berhe*, "as our understanding and recognition of implicit bias evolves, our procedures for addressing it must evolve as well." 193 Wn.2d at 663; *see also Zamora*, 199 Wn.2d at 722 (noting that "*Monday*'s past effort to address race-based prosecutorial misconduct by applying a harmless error standard has proved insufficient to deter such conduct"). Therefore, we hold that once a court has concluded that a prosecutor's conduct flagrantly or apparently intentionally appealed to jurors' racial bias, it cannot be cured and it is per se prejudicial. *Zamora*, 199 Wn.2d at 722.

As we have discussed above, the prosecutor in Bagby's case engaged in conduct that flagrantly or apparently intentionally appealed to racial bias and thus

undermined Bagby's credibility and the presumption of his innocence. Thus, we hold the prosecutor's conduct was per se prejudicial and reverse.

## CONCLUSION

As we have firmly stated, those who are accused of committing crimes are entitled to fair trials free of racial bias and prejudice. In this case, the prosecutor repeatedly evoked racist tropes and used racially coded language in a manner that cannot fairly be ignored. We conclude that the prosecutor's conduct in Bagby's case was improper and constituted a flagrant or apparently intentional appeal to racial bias in a way that undermined Bagby's credibility and his presumption of innocence, and such conduct is per se prejudicial. Thus, we reverse the Court of Appeals and remand to the trial court to vacate the convictions.

*State v. Bagby*
No. 99793-4

Montoya-Lewis, J.

WE CONCUR:

González, C.J.

Yu, J.

Whitener, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Bagby*, No. 99793-4
(Stephens, J., concurring)

No. 99793-4

STEPHENS, J. (concurring)—I agree with the lead opinion's conclusion that the prosecutor's repeated use of the term "nationality" to distinguish the defendant from other witnesses constituted a flagrant or apparently ill-intentioned appeal to jurors' racial bias. I also agree that the prosecutor's framing of some witnesses as "Good Samaritans" while conspicuously excluding the only Black witness—the person who pulled the defendant from the initial fight—constituted a flagrant or apparently ill-intentioned appeal to jurors' racial bias. Because the effect of these actions could not have been cured with a timely objection, the errors are prejudicial and warrant reversal.

The lead opinion goes on to find reversible error due to the prosecutor's references to the defendant's dog, noting stereotypes associating particular dog breeds with Black men or priming the jury to think of Michael Vick and associate Bagby with animal abuse. Lead opinion at 27-28 (citing Kevin Blackistone, Opinion, *Black Men and Dogs: Don't Believe Vick*, NPR (Sep. 25, 2007),

1

*State v. Bagby*, No. 99793-4
(Stephens, J., concurring)

http://www.npr.org/templates/story/story.php?storyId=14698643; Ann Linder, *The*

*Black Man's Dog: The Social Context of Breed Specific Legislation*, 25 ANIMAL L.

51, 57-58 (2018)). I do not believe the record in this case supports that conclusion,

and I do not join that portion of the lead opinion.

As the lead opinion correctly states, the test to determine if a prosecutor's

misconduct implicates racial bias is "whether an objective observer could view the

prosecutor's questions and comments as an appeal to jurors' potential prejudice,

bias, or stereotypes in a manner that undermined the defendant's credibility or the

presumption of innocence." Lead opinion at 17-18 (footnote omitted) (citing *State*

*v. Zamora*, 199 Wn.2d 698, 718, 512 P.3d 512 (2022)). To assist in determining

whether a statement could meet this test, we consider several factors: "the apparent

purpose of the statements, whether the comments were based on evidence or

reasonable inferences in the record, and the frequency of the remarks." *Zamora*, 199

Wn.2d at 718-19; *see State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011).

In the lead opinion's view, the prosecutor drew "attention to Bagby's race

through his questioning about Bagby's dog." Lead opinion at 24-25; *see also* 2 VRP

(Nov. 27, 2018) at 261-62 (prosecutor asking when Bagby got his dog and how long

he had his dog). The brief line of questioning culminated in the prosecutor asking

whether Bagby cared deeply about the dog. When Bagby confirmed that he did, the

prosecutor responded, "Unfortunately, some people [don't]; but I'm glad to hear

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Bagby*, No. 99793-4
(Stephens, J., concurring)

you're not one of them." 2 VRP (Nov. 27, 2019) at 262. The lead opinion frames

the prosecutor's questioning about Bagby's dog as unwarranted, an instance of

misconduct that "connects Bagby to dogs for no apparent reason." Lead opinion at

26.

Based on my review of the record, the apparent purpose of the prosecutor's

statement was to establish the credibility of Bagby's victim, Roberson, by showing

that Bagby trusted her enough to care for his dog, whom he loved.[1] The lead opinion

omits that Bagby—not the prosecution—first mentioned his dog when discussing

his relationship with Roberson during his direct examination:

> [DEFENSE COUNSEL]: Okay. Yesterday when you heard that [Roberson] was—she didn't really like you, that she was using you, did that surprise you?
>
> MR. BAGBY: Quite honestly, yes, . . . . *I felt safe enough, I mean, I felt comfortable around her to let her watch my dog if I walked to the store*. You know, I legitimately thought we were friends.

1 VRP (Nov. 27, 2019) at 227 (emphasis added).[2] The prosecutor's subsequent

cross-examination of Bagby flowed from this direct examination. And because the

---

[1] The lead opinion correctly states that the central inquiry "is not about the prosecutor's claimed subjective intent," but rather whether an objective observer could view the prosecutor's conduct as a flagrant or ill-intentioned appeal to racial bias. Lead opinion at 26 (citing *Zamora*, 199 Wn.2d at 718). But this does not exclude looking to the *apparent* purpose of the statement, as required by *Zamora*, and I would do so here. 199 Wn.2d at 718-19. As an appellate court, we consider the entire context of the statement.

[2] Bagby also volunteered information about his dog when he was asked on direct examination how the people at the fraternity party knew him: "[DEFENSE COUNSEL]:

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Bagby*, No. 99793-4
(Stephens, J., concurring)

record shows that Roberson's credibility was a central issue at trial, it was both logical and permissible for the prosecution to attempt to establish Roberson's credibility in the manner it did. *See, e.g.*, 2 VRP (Nov. 27, 2018) at 331-32 (defense counsel in closing argument identifying inconsistent narratives about Bagby and Roberson's relationship, specifically highlighting that Bagby allowed her to watch his dog); *contra* lead opinion at 26 ("[I]f there was [] a reason [for the prosecutor to ask about the dog], as the concurrence suggests, that reason would have been identified and argued before the jury.").

The lead opinion rejects this apparent purpose, arguing the prosecutor could permissibly impeach Roberson through this line of questioning only if he had "explicitly stat[ed his] purpose in asking about Bagby's dog and otherwise opining whether all dog owners love their dogs." Lead opinion at 28. The lead opinion also suggests that when impeaching a witness, counsel must relate all questions to "the charges or facts of the case." *Id.* at 26. But we have never held that counsel must expressly declare their intention to impeach during either direct or cross-

---

Did you know those guys that—in that frat house? A: They knew me, I have a very unique looking dog, surprisingly they recognized me from my dog. Q: What kind of dog do you have? A: He is a husky and [G]erman shepherd mix. Q: Okay. A: I'm typically known as Poseidon's owner, so. Q: The way, I'm sorry? A: My dog's name is Poseidon, a Greek God of the sea. Q: Poseidon? A: Yeah, he has baby blue eyes, I'm typically known as Poseidon's owner, so forget about the (inaudible) I have a name." 1 VRP (Nov. 27, 2018) at 234.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

examination. Nor have we ever announced a rule that impeaching questions must relate to a specific element of the charged conduct. Indeed, in *Henderson v. Thompson*, we recognized that tying impeaching statements directly to evidence in the case cannot excuse the improper use of language that appeals to racial bias. 200 Wn.2d 417, 438-39, 518 P.3d 1011 (2022) (trial judge abused discretion by excusing defense counsel's description of Black plaintiff's demeanor as "combative" and "confrontational" on the ground that the language was "'race neutral' and tied to the evidence"). Again, we look at the record as a whole and the context in which an objective observer would view the statements.

Unlike the lead opinion, I do not believe an objective observer would find that the prosecutor "repeatedly ask[ed]" about the dog. Lead opinion at 26 (emphasis omitted). The prosecutor questioned Bagby about his dog only while discussing Bagby's relationship with Roberson and only for a brief period during cross-examination. For example, just prior to asking Bagby about his dog, the prosecutor asked him about how long and how well he knew Roberson:

> [PROSECUTION]: So, you'd known—your relationship with Shyla Roberson was more casual when you guys were at Spokane Falls Community [College], is that correct?
>
> MR. BAGBY: Yes.
> . . . .
>
> Q: And you hung out quite a bit at WSU [(Washington State University)]?

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Bagby*, No. 99793-4
(Stephens, J., concurring)

MR. BAGBY: Yes, we did.

[PROSECUTION]: You'd been to her apartment?

A: Yes.

Q: Okay. And she'd been to yours?

A: Yes.

Q: She'd watch your dog for you while you went to the store?

A: Yes.

Q: How long have [you] had that dog?

2 VRP (Nov. 27, 2018) at 261.

I disagree that the prosecutor's statements about Bagby's dog constituted flagrant or apparently ill-intentioned prosecutorial conduct implicating racial bias. While I can understand how a line of questioning about dogs, breeds of dogs, or animal abuse might play on racial stereotypes, the conclusion that an objective observer could find that occurred in this case is, to me, unwarranted.[3]

---

[3] The lead opinion attributes to me an argument regarding the prosecutor's statement that Austin Davis, the person Bagby had punched, intervened in the bathroom incident even though "he doesn't have a dog in the fight." 1 VRP (Nov. 26, 2018) at 13. According to the lead opinion, I argue "that this phrase alone is not a callback to racist tropes about Black men, but rather a general reference to dogfighting and betting on the outcome of such now illegal dogfights." Lead opinion at 27 n.8. In fact, I make no such claim. Nor do I read the lead opinion as holding that the isolated use of this fairly common idiom in describing Davis's actions constituted reversible misconduct.

6

*State v. Bagby*, No. 99793-4
(Stephens, J., concurring)

With these observations, I respectfully concur in the decision reversing

Bagby's conviction and remanding for a new trial.

_____
Stephens, J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Gordon McCloud, J.